238 N.J. Super. 165 (1990)
569 A.2d 304
JAYBER, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
MUNICIPAL COUNCIL OF THE TOWNSHIP OF WEST ORANGE; TOWNSHIP OF WEST ORANGE, DEFENDANTS-RESPONDENTS, AND MR. AND MRS. JOHN BELEJACK, INTERVENORS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 19, 1989.
Decided February 2, 1990.
Before Judges PRESSLER, LONG and LANDAU.
Sheppard A. Guryan argued the cause for appellant (Lasser, Hochman, Marcus, Guryan and Kuskin, attorneys; Bruce H. Snyder, on the brief).
*166 Matthew J. Scola argued the cause for respondents Municipal Council of the Township of West Orange and the Township of West Orange.
Griffith H. Jones and Irwin P. Burzynski argued the cause for respondents Mr. and Mrs. John Belejack (Scarpone & Edelson and Griffith H. Jones, attorneys; Griffith H. Jones, of counsel; Irwin P. Burzynski, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This is an action in lieu of prerogative writs. Plaintiff Jayber, Inc., a New Jersey corporation, owns and operates a 131-bed nursing home located on an approximately five-acre portion of a 13.3 acre tract it owns in West Orange. It sought a use variance from the West Orange Board of Adjustment permitting it to construct and operate a 120-unit senior citizen congregate care housing facility adjunctive to the nursing home on another five-acre portion of the tract. The variance, subject to stated conditions, was granted by the board of adjustment, whose decision was appealed by objecting neighbors to the governing body. The governing body, after a de novo review, denied the variance, and plaintiff filed this complaint in the Law Division against the Township seeking relief from that denial. The objecting neighbors intervened. Plaintiff now appeals from the judgment of the Law Division dismissing its complaint. We reverse.
The material facts are not in substantial dispute. The premises are located on Northfield Avenue in an OB-1 zone. At the time of the municipal decision appealed from, the permitted uses in that zone included single family residences, office buildings, governmental uses, golf courses, and specific agricultural uses. Permitted conditional uses included gasoline stations, theaters, public utility buildings, and telephone exchanges. The nursing home was thus a nonconforming use which had been permitted by an earlier variance. During the *167 pendency of this matter in the Law Division, the ordinance was amended to permit nursing homes, hospitals and sanitariums in the OB-1 zone. The effect of the amendment was to render the present nursing home a conforming use. We do not address the question of whether the amendment also renders the proposed use a conforming one since we are convinced that the variance was improperly denied.
The congregate care facility which plaintiff proposes to construct is intended to provide housing and support services for elderly persons who are no longer able, by reason of age and associated disability, to live entirely independently but who are also not sufficiently ill, disabled or dependent to require nursing home placement. The facility was described by various of plaintiff's witnesses before the board of adjustment as something between traditional senior citizen housing consisting of fully self-contained apartments and a nursing home. This description applies not only to the modicum of support services implicit in the congregate housing plan but to its physical attributes as well. Hence, characteristics such as density, individual room area, common area per resident, and percentage of common area overall also lie between those typical of senior citizen housing and those typical of nursing homes. More specifically, this congregate housing plan proposes a two-story building containing 120 residential units of about 450 to 500 square feet in area, each containing full bath, bedroom, and modest kitchenette equipped with a small refrigerator and a two-burner stove. Each unit will be single occupancy except that double occupancy will be available for related persons, spouses, sisters, or brothers. In addition, there will be a congregate dining room in which each resident will be required to take a main meal daily. There are also proposed to be lounges, recreational and social activities, an exercise facility, a "wellness center," a nurse on the premises, physical and occupational therapy facilities, laundry facilities, a staffed "front desk," and other support services. Linens and housekeeping services are also to be provided. It is further anticipated that *168 there will be a certain amount of movement between the congregate care facility and the nursing home, which would, in effect, back each other up as a resident's personal situation improved or deteriorated. The monthly rental, which would include one meal daily, housekeeping services, and access to the support facilities, is presently projected at between $1,500 and $1,800 monthly and is not expected to be governmentally subsidized.
According to the proofs, New Jersey does not presently define or control congregate housing by statute or regulation other than the extent to which it may constitute a boarding or rooming house within the jurisdiction of the Department of Community Affairs. See generally N.J.S.A. 55:13B-1 to 21, and implementing regulations. It is not a facility within the jurisdiction of the State Department of Health's certificate of need procedure. However, Dr. Richard Goldstein, formerly State Commissioner of Health and now president of Continental Health Affiliates, plaintiff's parent corporation,[1] explained that during his tenure as Commissioner, the Department's policy manual governing long-term care facilities and services, codified as N.J.A.C. 8:33H, was amended to require applicants for a certificate of need for long-term nursing home beds to propose as part of the application both institutional and noninstitutional alternatives, the institutional alternatives including "residential health care, congregate housing, for example." N.J.A.C. 8:33H-3.3(a)(4). This amendment was not in effect when plaintiff's nursing home was granted, but as Dr. Goldstein testified, applicants for a nursing home certificate of need must now comply with it. Thus,
the health department is not going to even consider such an application to build a nursing home unless their projects also come with alternative non-institutional beds and what they spell out here is residential facilities or congregate housing.

*169 In other words, the health department was forcing nursing home developers to not only develop nursing home beds, but also to develop congregate housing and what precludes that policy is the clear notion that congregate housing is less expensive than nursing home beds. It is a pseudo-health care facility, if you will.
New Jersey ranks very high in the per capita elderly population. We have a very serious problem in New Jersey with housing the elderly. The health department looks upon itself to lower the cost of health care by providing less expensive alternatives for appropriate patients, those that would not need the total nursing services in a nursing home.
So residential health care facilities, congregate housing is part of the alternatives we are trying to offer the elderly in this state. Now, this application is a little different since the nursing home already existed. They already had a certificate of need, it was approved a long time ago. They had a nursing home on that particular site and now they are coming in to put up congregate care so that they are not involved in a situation of a certificate of need. The congregate care facility is not a health care facility per se under the legal definition.
It is a step down from a nursing home. That is, the patient will have a certain degree of independent living; yet, at the same time, the patients will have the opportunity for communal dining, they will have the opportunities for maid service, they would be transported in vans so that we try to maintain as much independent living as they are capable of.
Our elderly are faced with a situation where they just cannot seem to make it in their own apartments or own houses and only care to give them, people think, is to put them in a nursing home. Our elderly clearly want more alternatives and our health department has already recognized the great expense in terms of institutionalizing them and this is supposed to be somewhere midway between housing and a nursing home.
We further note that while congregate housing for the elderly, whether low-income or not, is not a defined or regulated concept in this state,[2] it is recognized as a constituent element of housing alternatives for low-income elderly by a variety of federal enactments. See, e.g., 42 U.S.C.A. § 1437e (congregate housing for displaced or elderly low-income families); 42 U.S.C.A. § 8001 to -10 (congregate housing services for elderly *170 persons receiving assistance from public housing agencies or nonprofit corporations); 42 U.S.C.A. § 1485(e)(3), implemented by 7 C.F.R. § 1944-205(h) (congregate housing for the elderly within the Department of Agriculture rural housing program).
The foregoing proofs respecting the nature of the proposed use were adduced in support of plaintiff's burden of demonstrating the requisite special reasons for the variance applied for. With respect to meeting the so-called negative criteria, the plaintiff relied on its proofs that the proposed use was significantly less intense and intrusive upon the surrounding area than permitted uses would be, particularly a 100,000 square foot office building. The primary focus of the objectors' concern was the potential traffic consequences of the application, both in terms of exacerbating already heavy traffic on Northfield Avenue and congesting the two side streets which would join Northfield Avenue to the proposed access to the facility. Plaintiff's experts testified, however, that Northfield Avenue, as demonstrated by gap studies, could accommodate the anticipated increase in vehicular traffic, especially since it could be expected that many, if not most, residents would not be driving or maintaining vehicles on the site and since there would likely not be a time-period concentration of vehicular movement. Moreover, the congregate housing use would, according to the experts and as a matter of common experience, generate substantially less vehicular traffic on Northfield Avenue than permitted uses, particularly a permitted office-building use. With respect to access to the site, not only the objecting neighbors but also the municipal engineer was concerned with the traffic consequences in respect of the residential side streets. Prior to the conclusion of the hearing before the board of adjustment, the plaintiff was able to represent to the board its ability and willingness to provide access directly onto Northfield Avenue in such manner as the engineer would recommend.
The ensuing resolution of the board of adjustment granting the requested variance made these findings of special reasons:

*171 a. The Department of Health of the State of New Jersey has established regulations, N.J.A.C. 8:33H-3.3(a)(4) set forth in its policy manual for planning and certificate of need reviews of long term care facilities (nursing homes). Said policy pre-conditions approval of new long term care facilities on the inclusion of alternate methods of care such as a congregate care facility.
b. The nursing home on the premises, Northfield Manor, was constructed prior to the passage of said regulations.
c. The Municipal Land Use Act of the State of New Jersey (N.J.S.A. 40:55D-1 et seq.) states that the promotion of senior citizen housing is one of the intents and purposes of the Act. See N.J.S.A. 40:55D-2(l).
d. The applicant proposes to construct a senior citizen congregate care complex adjacent to the Northfield Manor Nursing Facility.
e. The congregate care facility which has aspects, in its use, of both senior citizen housing and nursing home facilities is an inherently beneficial use to the community.
f. The congregate housing will fill a public need for those elderly individuals who cannot take care of themselves in a senior citizen housing complex, but yet do not require the long term, more intense care provided in a nursing home facility.
g. The purpose of the proposed facility is to provide housing for those individuals who cannot live in a senior citizen facility, yet do not require nursing home care and wish to have some supervision, some protection, and a modicum of independence.
h. The siting of the proposed facility to an adjacent nursing home does provide additional benefits to the residents in that, in an emergency or on an appointive basis, there are additional medical personnel and programs available at the nursing facility.
i. The use of the facility in terms of traffic and intensity of construction on the site when compared to the allowable use promotes other aspects of the Municipal Land Use Law with a less intense use in terms of traffic and lot coverage which further enhances the special reasons set forth above.
j. The use proposed is not intense in light of those individuals expected to utilize the facility.
k. There is a positive advantage under the Township zoning plan to have a consistent and supplementary use to the nursing home on the subject premises.
The proposed congregate care facility is such a use.
With respect to the negative criteria, the resolution had this to say:
a. The traffic impact on Northfield Avenue from the premises would be minimal.
b. The traffic impact when compared to the traffic impact of allowable use is reduced greatly.
c. Throughout the Township of West Orange the density of senior citizen complexes is greatly in excess of the density proposed by this particular applicant.

*172 d. The applicant has submitted a plan which shows access through Glenview Drive which access can be modified due to the topography of the property to permit the principal access directly from Northfield Avenue thereby alleviating any impact on Glenview Avenue.
e. The proposed use is a less intense use of the premises than that permitted by ordinance in terms of traffic, lot coverage and residents' life style and therefore does comport with the intent and purpose of the zone plan as stated in the Township of West Orange Zoning Ordinance and the New Jersey Municipal Land Use Act.
Accordingly, the application was granted subject to site plan and other required approvals and subject to the following conditions:
1. The total occupancy of the premises will be limited to 200 residents.
2. No more than two individuals shall occupy a unit and said individuals must be related.
3. Residents must be 62 years of age or older.
4. The principal access to the congregate care facility shall be directly from Northfield Avenue with other access restricted subject to approval of the Township Engineering Department.
5. The premises in question shall not be subdivided nor shall any other principal uses constructed thereon. A covenant running with the land will be recorded before a Certificate of Occupancy is issued....
The governing body, in its de novo review, disagreed with all of the board's critical findings, adopting a resolution which denied the variance for these reasons:
1. There was no evidence presented to the Zoning Board regarding the impact of a congregate care facility upon area traffic.
2. There was insufficient evidence presented to the Zoning Board as to the impact upon the surrounding neighborhood of the use of the subject property as a congregate care facility.
3. There was insufficient evidence presented as to whether the use of the subject premises as a congregate care facility was beneficial to the public good or served the best interests of the Township of West Orange.
4. The use of the subject premises as a congregate care facility constitutes an expansion of a nonconforming use.
The Law Division judge, in affirming the governing body, concluded that the record supported its findings. The court further opined that the apparent special reasons supporting the application were undermined by plaintiff's future opportunity to dispense with the congregate care aspects of the facility if they were not profitable and to operate the facility simply as a *173 customary multiple family apartment house, a use prohibited in the zone. Thus, it concluded that "* * * there is no requirement whatsoever with respect to maintaining the facility in the proposed fashion." Implicit in this view of the court was the apparent notion that since the facility was not governmentally regulated, the terms of the variance grant would not be binding on the owner. Also implicit was the view that the facility's potential inherent benefit to the public welfare was abrogated by its unavailability to a low-income subsidized elderly population since it would be affordable only by the middle class, upper middle class or affluent elderly. Finally, the court was satisfied that the traffic consequences of the proposed use justified the negative criteria findings of the governing body, noting further the irrelevance, in its view, of comparing those consequences with the more serious traffic impact of permitted commercial uses.
In considering the issues before us, we are mindful of our obligation to accord the action of the governing body  not the board of adjustment  the presumption of validity and to defer to its judgment and its peculiar knowledge of local conditions so long as its decision is supported by the record and is not so arbitrary, unreasonable or capricious as to amount to an abuse of discretion. Com. for a Rickel Altern. v. City of Linden, 111 N.J. 192, 199, 543 A.2d 943 (1988); Medici v. BPR Co., 107 N.J. 1, 526 A.2d 109 (1987); Evesham Tp. Bd. of Adj. v. Evesham Tp., 86 N.J. 295, 430 A.2d 922 (1981). Our careful review of the record with respect both to the special reasons and negative criteria requirements of N.J.S.A. 40:55D-70(d), persuades us that the determination of the governing body fails to meet even this liberal standard of deferential review. We are further satisfied that the record lacks substantial evidence contradictory of the board of adjustment's findings and, hence, that the governing body's denial of the variance, as conditioned by the board of adjustment, constituted a reversible abuse of discretion.
*174 We are, of course, guided by the principles governing the grant of use variances restated by the Supreme Court in Medici v. BPR Co., 107 N.J. 1, 526 A.2d 109 (1987). We thus appreciate that in dealing with a use variance, the applicant must first show special reasons, namely, that the grant of the variance will either serve the general welfare or promote one or more of the purposes of zoning as defined by N.J.S.A. 40:55D-2. The applicant must also meet the negative criteria, namely, the demonstration that the "relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70(d). With respect to special reasons, plaintiff asserts that the use serves the general welfare and is therefore an inherent beneficial use entitling it to the variance so long as the negative criteria are met. It also urges that the use will promote the zoning purpose of encouraging senior citizen community housing. N.J.S.A. 40:55D-2(l). We are satisfied that a special reason grounded in an inherently beneficial use was convincingly and unquestionably demonstrated.
We first recognize that the variance sought here was essentially in aid of a commercial use. There is no question that the congregate care facility here proposed is envisioned as a profit-making enterprise, as is the nursing home currently operated on the property. We also recognize, as made clear by Medici, that commercial uses, unlike institutional and quasi-institutional ones, do not ordinarily meet the special-reason standard of inherently serving the public good. Nevertheless, as Medici also points out, there are some commercial uses which do "inherently serve the general welfare." 107 N.J. at 18, 526 A.2d 109.[3] We are of the view that the use proposed here both *175 advances the senior citizen housing purpose of N.J.S.A. 40:55D-2(l) and is also, beyond debate, an inherently beneficial use in that it promotes the general welfare.
In the companion cases of Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249 (1976), reprinted at 80 N.J. 6, 364 A.2d 1016 (1976), and Shepard v. Woodland Tp. Comm. and Planning Bd., 71 N.J. 230, 364 A.2d 1005 (1976), the Supreme Court, marshalling an impressive array of legal, statistical, and sociological source materials, made clear that the aging of the population[4] and the special housing needs of the elderly, irrespective of their individual financial resources, create significant social problems which government, as a matter of the general welfare, is obliged to address. As Justice Pashman wrote in Weymouth, 80 N.J. at 26, 364 A.2d 1016:
In part, though, the need for specialized housing transcends economic status and results from the particular physical and social problems of the elderly. The desirability of housing to meet the special physical needs of the elderly is summarized in a report by the N.J. Office on Aging:
The needs of the elderly differ from those of the rest of the general populace; muscles and skin become less pliable with increased age, bones become more brittle, and hearing and sight begin to fail. The older person has difficulty in performing normal home maintenance tasks.
To the elderly, accidents in the home are a real danger. Falls, for example, are the leading cause of accidental death for those 65 and over. Throw rugs, stairs and many other objects can cause serious accidents. Older people have different needs, and housing is one area where special consideration must be given. Plans should include more and wider walkways with fewer stairs, an interior and exterior design to permit easy social contact, provision for common rooms, short distances between buildings, easy refuse collection, little maintenance, and well-lighted walkways and halls. *176 In addition, housing designed for the elderly should include such facilities as a central dining room, health care facilities and recreational facilities. [Housing New Jersey's Elderly, supra at 4]
And in Shepard, supra, Justice Pashman explicitly recognized that society's obligation to provide appropriate housing opportunities for the elderly encompass those who are not only financially constrained but the "semi-affluent, professional or skilled" as well. 71 N.J. at 242, 364 A.2d 1005. That the special needs of the elderly are at least as much a function of their stage of life as of their economic status is also recognized by our own Legislature, which stated, among its findings in support of the establishment of the Division on Aging, that not only the elderly who suffer from poverty and dependency but also "all senior citizens in general need and deserve the attention, assistance and protection of the State." N.J.S.A. 52:27D-28.1(b). See also N.J.S.A. 52:27D-29.23 stating the legislative findings in support of establishing the Policy Center on Aging.[5]
We appreciate that the cost of residency of the proposed congregate care facility will place that alternative beyond the means of many elderly, but many will be able to afford it.[6] For *177 those who can, it presents an unfortunately rare opportunity to continue to live privately, as independently as they are able, and in dignity while at the same time the essential nutritional, physical and social needs they cannot meet for themselves are being met for them. That is the essence of congregate care housing, and such a facility is inherently beneficial within the intendment of the special reason requirement for a use variance. The governing body's contrary findings are unsupported and unsupportable. Any legitimate concern on the part of the governing body that the support services characterizing congregate care housing might be discontinued in the future can be met by conditioning the variance on their continued provision.
We consider now the negative criteria as found both by the governing body and the board of adjustment. First, the board's Northfield Avenue access condition clearly resolves the concern of overuse or inappropriate use of the residential side streets. Moreover, contrary to the governing body's conclusionary statement that there was no evidence or insufficient evidence of the traffic impact of the facility and of the impact of the facility on the surrounding neighborhood, the proofs before the board were replete with evidence that neither impact would be substantial and that, in these terms, the facility would be vastly preferable to a permitted office building use. We are convinced that the conclusionary statements of the governing body are not only technically inadequate but that they are also contrary to the undisputed proofs of record.
We are also convinced that the board of adjustment's findings respecting plaintiff's meeting of the negative criteria were not merely supported by the record but were virtually mandated by it. In Medici, supra, the Court, referring to a commercial use not inherently beneficial, held that in order to meet the *178 negative criteria prescribed by N.J.S.A. 40:55D-70(d), both the applicant's proofs and the board's findings "must reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the zoning district." 107 N.J. at 21, 526 A.2d 109. Even if that enhanced standard were applicable here, we regard that reconciliation as self-evident in the circumstances before us. The proposed use is functionally adjunctive to an existing use. More significantly, it shares significant physical and functional attributes with the now permitted nursing home, hospital and sanitarium uses. Furthermore, we have no doubt that if the congregate care facility had been originally proposed by plaintiff as part of its certificate of need application and if a certificate of need had been granted by the Department of Health predicated upon that adjunctive facility, the congregate care facility would have to be regarded as a permitted use under the amended zoning ordinance, at least as in the sense of a legal and functional accessory to the permitted nursing home use. In sum, there is no significant depreciation or compromise of the present zone plan and ordinance which this use would effect nor any undermining of any legitimate zoning desiderata.
As we have noted, plaintiff argues on appeal that no variance is now required for the congregate care housing facility because it is now a permitted use by reason of the ordinance amendment which was adopted at about the same time as the Law Division's decision of this matter. Since we have decided that plaintiff is entitled to the variance it sought, we need not decide the issue, and we decline to do so since it was not considered below. Thus, although there are clear similarities between the proposed congregate care housing facility and the now permitted health care facilities, defendants are nevertheless entitled to the opportunity to adduce proofs demonstrating that any differences between them are sufficiently significant to warrant their non-inclusion as a matter of applicable principles of statutory construction. Cf. Urban Farms, Inc. v. *179 Franklin Lakes, 179 N.J. Super. 203, 431 A.2d 163 (App.Div. 1981), certif. den. 87 N.J. 428, 434 A.2d 1099 (1981).
The decision of the Law Division dismissing plaintiff's complaint is reversed. We remand for entry of judgment granting the use variance as conditioned by the board of adjustment and subject to the further condition that the projected support services, and particularly the congregate dining facility, may not be discontinued so long as the facility operates under the variance grant.
NOTES
[1] Dr. Goldstein was State Commissioner of Health from May 1982 to October 1984 and commenced employment by Continental Health Affiliates in July 1985. He denies having any disqualifying conflict of interest, and we perceive none.
[2] Legislative attention in New Jersey to housing for the elderly is addressed by, among other statutes, N.J.S.A. 55:14I-1 et seq. (senior citizen housing); N.J.S.A. 52:27D-28 et seq. (Division on Aging); N.J.S.A. 52:27D-29.23 (Policy Center on Aging); N.J.S.A. 45:22A-1 et seq. (Retirement Community Full Disclosure Act). It is also, of course, addressed by N.J.S.A. 40:55D-2(l), which lists, as a purpose of zoning, the encouraging of senior citizen community housing construction.
[3] See, illustrative of inherently beneficial commercial uses, Alpine Tower v. Mayor & Council, 231 N.J. Super. 239, 555 A.2d 657 (App.Div. 1989) (commercial radio transmission tower held to be inherently beneficial); Yahnel v. Bd. of Adjust. of Jamesburg, 79 N.J. Super. 509, 192 A.2d 177 (App.Div. 1963), certif. den. 41 N.J. 116, 195 A.2d 15 (1963) (dial telephone service center held to be inherently beneficial); Wickatunk Village, Inc. v. Tp. of Marlboro, 118 N.J. Super. 445, 288 A.2d 308 (Ch.Div. 1972) (developer's construction of tertiary sewer treatment plant to service a commercial trailer park held to constitute an inherently beneficial use).
[4] The phenomenon of proportional increase of the aged population has continued since Weymouth was decided. Bureau of the Census Statistical Abstract of the United States 1989, at 13, 14, 17.
[5] In his 1988 line item veto of this legislation, Governor Kean nevertheless noted that:

New Jersey is home to 1.3 million elderly. This part of our sprawling family makes a unique contribution to New Jersey's rich and varied tapestry. Yet, we are conscious of the fact that elderly citizens need and deserve special attention and care. That is why 17 of the 19 State agencies have programs designed to assist the aging. More than $2 billion in federal and State funds are administered annually for those programs.
I believe the Policy Center on Aging created by this bill will enhance the already significant efforts being undertaken in this State to make sure that our elderly are cared for in the best ways possible. The Center will help to coordinate and centralize data from the myriad programs that currently exist. Moreover, I am hopeful that the research conducted at the Policy Center will help us to make informed and effective decisions about future programs.
[6] We note that a principal sum of $225,000 would at 8 percent interest produce a sum sufficient to pay the annual charges. We further note the testimony that the typical residents of such a facility are either elderly couples who must give up the home in which they can no longer manage or a surviving spouse who does so on the death of the other. Clearly, the proceeds of sale of a family home together with life insurance proceeds, irrespective of any other retirement income or assets, might well be sufficient for many elderly residing in suburban Essex County to fund the costs of congregate care housing.