592 A.2d 270

RIESE–ST. GERARD HOUSING CORPORATION, A NOT-FOR-PROFIT HOUSING CORPORATION ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. CITY OF PATERSON, A MUNICIPAL CORPORATION ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY; THE MAYOR AND CITY COUNCIL OF THE CITY OF PATERSON, DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued May 21, 1991—Decided June 14, 1991.

206

Before Judges PRESSLER, DEIGHAN and BAIME.

*Susan E. Champion,* First Assistant Corporation Counsel, argued the cause for appellants (*Ralph L. DeLuccia, Jr.,* Corporation Counsel, attorney; *Susan E. Champion* on the brief).

*Joseph M. Andresini* argued the cause for respondent (*Andora, Palmisano & Geaney,* attorneys; *Joseph M. Andresini* of counsel and on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

This appeal requires us to construe sections of the Senior Citizens Nonprofit Rental Housing Tax Law (*N.J.S.A.* 55:14I–1 to –9). This statutory scheme authorizes municipalities to exempt from real property taxes nonprofit housing projects for the elderly funded under the Federal Senior Citizens Housing Loan Program authorized by the Federal Housing Act of 1959, more commonly known as section 202 (12 *U.S.C.A.* § 1701q (1989)). The federal program is augmented by 42 *U.S.C.A.* § 1437f (1990) (section 8) under which eligible low-income tenants pay a percentage of adjusted incomes as rent and the remainder is subsidized by the United States Department of Housing and Urban Development (HUD). Under the New Jersey Act, nonprofit housing projects are to pay 15% of their "annual gross rents" in lieu of real property taxes. *N.J.S.A.* 55:14I–5. At issue is whether section 8 subsidies are to be considered in determining gross rents for the purpose of calculating the project's payment in lieu of taxes. The problem is compounded by HUD's long-standing policy in New Jersey which requires as a precondition to the release of section 202 funds that section 8 subsidies be excluded in determining a project's payment in lieu of taxes. We are convinced that the New Jersey Act was designed to implement and effectuate federal funding programs to assist the elderly in pursuit of decent housing. We thus construe the tax exemption provision as barring inclusion of federal rent subsidies in determining a nonprofit project's payment in lieu of taxes.

Additional questions are presented concerning plaintiff's application for a use variance. We hold that a nonprofit senior citizen housing project constitutes an inherently beneficial use. We also conclude that the grant of the variance sought here will not substantially impair the intent and purpose of the

master plan and zoning ordinance.[1]

## I.

The facts are not in dispute. Plaintiff is a nonprofit corporation organized to provide elderly and handicapped persons with housing facilities. It is one of three corporations created by the Paterson Diocese of the Roman Catholic Church. These corporations have constructed 414 units of senior citizen housing since 1967.

Several years ago, plaintiff purchased approximately one acre of vacant land from St. Gerard's Parish. The property is located at 505 West Broadway in Paterson. Plaintiff seeks to construct 31 units of senior citizen housing, consisting of 22 one-bedroom apartments and eight studio apartments. The property is in a R-1 residential district which permits single family detached dwellings. The surrounding area consists of one- and two-family homes, numerous garden apartments, a Salvation Army building, several small commercial establishments and a fire house. According to plaintiff, the site is ideal for senior citizen housing because it is located on a major arterial road well-serviced by public transportation and in close proximity to a shopping area.

Based upon these considerations, plaintiff applied for a use variance to permit construction of an apartment building in a single family residential zone. Plaintiff also sought a variance for a minor deviation from the floor area requirement of the zoning ordinance. Following public hearings, the Board of Adjustment approved the application. In its resolution, the Board found that there was an "absolute need" for low-income subsidized housing for the elderly and that the site was "partic-

---

[1]The remaining issue raised by defendants is meritless. *R.* 2:11–3(e)(1)(E). We need not consider whether, as defendants contend, the tax abatement under *N.J.S.A.* 55:14I–5 is discretionary. The question of tax abatement was never presented to the governing body.

ularly suitable" for the proposed development because of its proximity to public transportation and shopping areas. The Board also made particularized findings that the variances sought were consistent with the master plan and zoning ordinance. In that respect, the Board concluded that the development would "blend in with the immediately surrounding area" consisting of mixed uses, that the lot coverage of approximately 25% was consistent with the surrounding area, and that the master plan encouraged the development of housing for senior citizens.

In its *de novo* review, the governing body, without elucidation, disagreed with all of the Board's critical findings. The Council rejected the Board's determination that there was a need for senior citizen housing, noting that the evidence presented by plaintiff supporting that conclusion constituted unsubstantiated hearsay. The Council also found the "density of the development" was inconsistent with the surrounding neighborhood and conflicted with the intent and purpose of the zoning ordinance. Plaintiff's application was thus denied.

While these proceedings were ongoing, plaintiff was attempting to obtain federal funding for the project from HUD. Unfortunately, the record concerning these negotiations is not complete. However, both counsel have stipulated that HUD will not release section 202 funds unless the sponsor has entered into a tax exemption agreement with local authorities. As noted previously, it is HUD's long-standing policy to deny section 202 funds unless the municipality has agreed to accept payments in lieu of taxes determined by the gross annual rents paid by the tenants. HUD mandates that, in determining gross rents, section 8 subsidies are not to be included.

█ Plaintiff filed a formal application with HUD, seeking section 202 funding. Section 202 provides funds for acquisition and construction of public housing projects. 12 *U.S.C.A.* § 1701q (1989). This is accomplished by way of a mortgage and note taken back by HUD on the subject property. HUD

granted a fund reservation, insuring that, upon satisfaction of certain conditions, federal monies would be made available to plaintiff for the construction of the proposed project. One of the conditions is that plaintiff, the sponsor, must demonstrate to HUD that it will have sufficient revenues to fund its annual operating budget, including payment of debt service. 24 *C.F.R.* § 885.210 (1990). Section 202 rests on the premise that the income of the tenants will not exceed 50% of the median income for the county in which the project is located. 24 *C.F.R.* § 813.102 (1990). Thus, in order to receive federal funding, plaintiff will be required to establish that the project will house low-income senior citizens.

Section 202 also places a restriction on the amount of rent a tenant will be required to pay the sponsor. 12 *U.S.C.A.* § 1701q(h)(4)(C) (1989); 42 *U.S.C.A.* § 1437a(a) (1991). The amount of rent may not exceed 30% of the tenant's income. *Ibid.* The project that is contemplated by plaintiff is for elderly persons with extremely low income. Therefore, it is anticipated that few, if any, tenants will be able to pay the maximum amount of gross rent permitted under section 202. Plaintiff thus filed an application with HUD for section 8 subsidies. The section 8 funding fluctuates on a year-to-year basis, depending on the amount of rents collected from the tenants and the funds necessary to meet the sponsor's operating budget. 24 *C.F.R.* 880.603(4)(c) (1990). The record reflects that approximately $276,000 in annual section 8 funding will be necessary to meet plaintiff's operating expenses and debt service.

Based upon the need for federal funding under both section 202 and section 8, plaintiff sought a tax exemption from the municipality under *N.J.S.A.* 55:14I-5. Because of HUD's requirement that section 8 subsidies are not to be considered rent in determining a sponsor's payments in lieu of taxes, plaintiff proposed that it pay the City 15% of the annual rents received from the tenants. The City's attorney rejected this proposal, contending that *N.J.S.A.* 55:14I-5 required inclusion of federal subsidies in determining "annual gross rents."

Plaintiff instituted an action in the Law Division, seeking a declaratory judgment that "annual gross rents" under *N.J.S.A.* 55:14I-5 do not include section 8 assistance funds. In a separate count, plaintiff sought a reversal of the Council's denial of its application for a use variance. The Law Division judge rendered an oral opinion in which he concluded that payments in lieu of taxes were to be calculated based upon rents actually received from tenants, not including section 8 funds. The judge also found that the Council's denial of a use variance was arbitrary and capricious. This appeal followed.

## II.

We hold that "annual gross rents" under *N.J.S.A.* 55:14I-5 do not include section 8 federal assistance subsidies for the purpose of determining the amount to be paid in lieu of taxes by a nonprofit senior citizen housing project. As we noted previously, *N.J.S.A.* 55:14I-5 permits a municipality's governing body to adopt a resolution authorizing a section 202 nonprofit housing project for elderly persons to pay in lieu of taxes 15% of its "annual gross rents." Unfortunately, the phrase "annual gross rents" is not defined. *See N.J.S.A.* 55:14I-3. The traditional definitions of the word "rent" are not particularly helpful. The term has been variously defined as "the consideration paid by a tenant for the use or occupation of property," *Modular Concepts, Inc. v. South Brunswick Tp.*, 146 *N.J.Super.* 138, 147, 369 *A.*2d 32 (App.Div.1977), certif. den. 74 *N.J.* 262, 377 *A.*2d 667 (1977), or the amount of "compensation paid, either in money, labor, produce or something similar, for the use of real estate." 22 *N.J.Practice (LeWine, Landlord and Tenant Law)* (3 ed. 1962), § 1411 at 776; *see also Vineland Shopping Center, Inc. v. De Marco*, 35 *N.J.* 459, 470, 173 *A.*2d 270 (1961); *Parkway, Inc. v. Curry*, 162 *N.J.Super.* 410, 417, 392 *A.*2d 1260 (D.Ct.1978). Neither of these definitions is particularly compelling in the context of the issue presented. Instead, the meaning of the term is to be derived from the spirit and purpose of the statutory scheme.

The underlying purpose in enacting the New Jersey legislation was to encourage nonprofit corporations to construct and operate housing facilities for low-income senior citizens with the use of section 202 funds. This objective is clearly articulated in the legislative findings and declarations which recite that there is a "seriously inadequate supply of decent, safe and sanitary rental housing for elderly persons ... in the lower middle-income brackets," that the need can be met through "the erection and operation of nonprofit rental housing projects ... with direct loans from the United States under the Senior Citizens Housing Program, and pursuant to section 202 of the Federal Housing Act of 1959," and that "such housing for the elderly is a public purpose worthy" of State and municipal "cooperation." *N.J.S.A.* 55:14I-2. Other sections authorize the creation of nonprofit corporations organized for the purpose of "secur[ing] the financial aid of the [f]ederal [g]overnment." *N.J.S.A.* 55:14I-4.

*N.J.S.A.* 55:14I-5 is the cornerstone of the Act. By authorizing municipalities to grant tax abatements to federally funded nonprofit senior citizen housing projects, the Legislature clearly intended to facilitate participation in the section 202 program. As we pointed out earlier in our opinion, the federal government has long required tax abatement agreements as a condition to the release of section 202 funds. The Legislature plainly recognized that the availability of federal funding depended upon compliance with HUD's regulatory requirements. That this is so is best evidenced by *N.J.S.A.* 55:14I-6(3), which provides that a municipality granting a tax exemption may "[r]equire proof of compliance by the owning nonprofit corporation of adherence to the provisions of any Federal Regulatory Agreement or other Federal regulations," and by *N.J.S.A.* 55:14I-7, which states that "[n]othing in this act shall be construed as a limitation of the power of the Federal Government to prescribe rules and regulations with respect to the development or administration of elderly persons housing projects."

We are obliged to construe the Act consonant with its clearly articulated objectives. The entire thrust of the legislative effort was to assure the availability of section 202 funds for the purpose of constructing and operating housing facilities for low-income senior citizens. Although section 202 and section 8 are parts of different federal acts, and while a sponsor may utilize section 202 funds without seeking section 8 subsidies, the programs are clearly interrelated. Both programs are in furtherance of a common purpose. Section 202 states, "[t]he purpose of this section is to assist private nonprofit corporations ... to provide housing and related facilities for elderly or handicapped families." 12 *U.S.C.A.* § 1701q(a)(1) (1989). Section 8 authorizes assistance payments "[f]or the purpose of aiding low-income families in obtaining a decent place to live...." 42 *U.S.C.A.* § 1437f(a) (1991). Although the New Jersey Act refers only to section 202,[2] that federal statute and its implementing regulations are replete with references to section 8. *See, e.g.,* 12 *U.S.C.A.* § 1701q(g) (1989); 12 *U.S.C.A.* § 1701q(h)(4)(C) (1989); Subsec. (g) Pub.L. 96–153, § 306(d); Section 210(g) of Pub.L. 93–383; Section 162(d) of Pub.L. 100–242. Section 202 expressly states that "[i]n carrying out the provisions of this section and section 8 [the programs] shall be coordinated in an economical and efficient manner." 12 *U.S. C.A.* § 1701q(g) (1989).

In light of the interplay between *N.J.S.A.* 55:14I–5, section 202, and section 8, we construe the phrase "annual gross rents" to comport with the federal requirement that section 8 assistance may not be considered in determining a nonprofit housing project's payment in lieu of taxes. This interpretation of the statutory language best advances the legislative goal. *See* *N.J.S.A.* 55:14I–9.

---

[2]The Section 8 program was implemented approximately a decade after the enactment of the Senior Citizens Nonprofit Rental Housing Tax Law. Therefore, the originally enacted statute did not anticipate Section 8 rent subsidies in the calculation of "annual gross rents" since the program was not in effect.

## III.

We are convinced that the Council's denial of a use variance was arbitrary and capricious. In reaching this conclusion, we are mindful of our obligation to accord the action of the governing body—not the board of adjustment—the presumption of validity and to defer to its judgment and its knowledge of local conditions so long as its decision does not amount to an abuse of discretion. *See Jayber, Inc. v. West Orange Municipal Council*, 238 *N.J.Super.* 165, 173, 569 *A.*2d 304 (App.Div.1990), certif. den. 122 *N.J.* 142, 584 *A.*2d 214 (1990); *see also Committee for a Rickel Altern. v. City of Linden*, 111 *N.J.* 192, 199, 543 *A.*2d 943 (1988); *Medici v. BPR Co.*, 107 *N.J.* 1, 22, 526 *A.*2d 109 (1987); *Evesham Tp. Bd. of Adj. v. Evesham Tp.*, 86 *N.J.* 295, 302, 430 *A.*2d 922 (1981). We are persuaded, however, that the Council's determination fails to satisfy even this liberal standard of review.

Initially, we are convinced that a nonprofit housing project for low-income senior citizens inherently serves the general welfare. *Medici v. BPR Co.*, 107 *N.J.* at 18, 526 *A.*2d 109; *DeSimone v. Greater Englewood Housing Corp. No. 1*, 56 *N.J.* 428, 440, 267 *A.*2d 31 (1970); *Burton v. Montclair*, 40 *N.J.* 1, 4, 190 *A.*2d 377 (1963); *Andrews v. Ocean Tp. Bd. of Adj.*, 30 *N.J.* 245, 251, 152 *A.*2d 580 (1959); *Borough of Roselle Park v. Union Tp.*, 113 *N.J.Super.* 87, 98, 272 *A.*2d 762 (Law Div.1970). As we noted earlier, both the federal and state governments have recognized the need for affordable housing for the elderly. Our Legislature has devoted substantial attention to the housing needs of senior citizens. *See, e.g., N.J.S.A.* 2A:18–61.22 et seq. (Senior Citizens and Disabled Protected Tenancy Act); *N.J.S.A.* 55:14I–1 et seq. (Senior Citizens Nonprofit Rental Housing Tax Law); *N.J.S.A.* 52:27D–28 (Division on Aging); *N.J.S.A.* 52:27D–29.23 (Policy Center on Aging); *N.J.S.A.* 45:22A–1 et seq. (Retirement Community Full Disclosure Act). We note in that respect that the Municipal Land Use Law expressly recognizes, as a purpose of zoning, the encour-

agement of senior citizen community housing construction. *N.J.S.A.* 40:55D–2(*l* ).

The courts have also addressed questions pertaining to the special housing needs of the elderly. *See Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.,* 71 *N.J.* 249 (1976), reprinted at 80 *N.J.* 6, 364 *A.*2d 1016 (1976), cert. den. 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977); *Shepard v. Woodland Tp. Comm. and Planning Bd.,* 71 *N.J.* 230, 364 *A.*2d 1005 (1976); *Jayber, Inc. v. West Orange Municipal Council,* 238 *N.J.Super.* at 175, 569 *A.*2d 304; *Edgewater Inv. Associates v. Borough of Edgewater,* 201 *N.J.Super.* 267, 493 *A.*2d 11 (App.Div. 1985), aff'd 103 *N.J.* 227, 510 *A.*2d 1178 (1986). In *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.,* our Supreme Court observed that "[a]s a consequence of declining birth rates and longer life expectancies, the elderly are increasing both in absolute numbers and in relative proportion to the total population." 80 *N.J.* at 23, 364 *A.*2d 1016. Against this backdrop of sharp demographic changes, "public attention has increasingly focused upon the problems of the aged." *Edgewater Inv. Associates v. Borough of Edgewater,* 201 *N.J.Super.* at 279, 493 *A.*2d 11. Although the problem is national in scope, *see 2 White House Conference on Aging, Toward a National Policy on Aging* at 29–36 (1971); *President's Task Force on Aging, Toward a Brighter Future for the Elderly* at 38–40 (1970), it is perhaps more acute in New Jersey by reason of the density of our population and our long history of housing crises. *New Jersey Office on Aging, A Community Guide: Housing New Jersey's Elderly* (1971); *see also Inganamort v. Fort Lee,* 62 *N.J.* 521, 303 *A.*2d 298 (1973); *Marini v. Ireland,* 56 *N.J.* 130, 265 *A.*2d 526 (1970). In part, the need of the elderly for affordable housing "results from the fixed and limited incomes upon which many older persons are dependent." *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.,* 80 *N.J.* at 25, 364 *A.*2d 1016. Many others "must devote a disproportionate amount of their available resources to housing costs." *Ibid.*

In light of the well-chronicled critical shortage of housing suitable to meet the needs of the elderly, we are satisfied that the proposed project is an inherently beneficial use. The Council's conclusory rejection of this thesis was wholly arbitrary.

We are equally convinced that the conclusory statements of the governing body concerning the statutory negative criteria were not only technically inadequate, but also contrary to the largely undisputed proofs of record. The Board of Adjustment's detailed findings were not merely supported by the record "but were virtually mandated by it." *Jayber, Inc. v. West Orange Municipal Council*, 238 *N.J.Super.* at 177, 569 *A.*2d 304. We are thoroughly convinced that plaintiff's evidence satisfied the "enhanced quality of proof" standard adopted in *Medici v. BPR Co.*, 107 *N.J.* at 21, 526 *A.*2d 109.

The judgment of the Law Division is affirmed.