640 A.2d 356

KINGWOOD TOWNSHIP VOLUNTEER FIRE COMPANY NUMBER ONE AND BELL ATLANTIC MOBILE SYSTEMS, INC., PLAINTIFFS, v. BOARD OF ADJUSTMENT OF THE TOWNSHIP OF KINGWOOD AND THE TOWNSHIP OF KINGWOOD, A MUNICIPAL CORPORATION, DEFENDANT.

Superior Court of New Jersey
Law Division Hunterdon County

Decided September 16, 1993.[1]

---

[1] This is an amplification of an oral bench decision.

*Lee B. Roth* for Plaintiffs.

*J. Douglas Orr* for Defendants.

BERNHARD, J.S.C.

I. *Background*

This is an action in lieu of prerogative writs brought by the Kingwood Township Volunteer Fire Company Number One (the Fire Company) and Bell Atlantic Mobile Systems, Inc. (B.A.M.S.) against the Board of Adjustment of the Township of Kingwood and the Township of Kingwood. B.A.M.S. and the Fire Company (jointly, the plaintiffs or the applicants) seek to overturn a decision of the Board of Adjustment of the Township of Kingwood (the Board) denying a requested use variance to expand an existing nonconforming use.

Plaintiff Fire Company is the owner of block 19, lot 401, a 3.003 acre tract in the AR–2 residential zoning district (the site). Existing on the site at the time of application was a 75–foot lattice

antenna tower facilitating Fire Company communications and a 70– by 120–foot block building used as a firehouse. The lease agreement between the plaintiffs permits B.A.M.S. to replace the existing 75–foot tower with a larger 197–foot tower. The new 197–foot tower allows B.A.M.S. to adequately service its cellular communications coverage area while simultaneously permitting the Fire Company to improve its communication capabilities. The expansion of B.A.M.S.'s cellular communication coverage area is required by the terms of its franchise agreement with the Federal Communications Commission. To maintain the expanded 197–foot antennae tower, B.A.M.S. would also require authorization to construct a small 12–foot by 30–foot block building for installation of its modular equipment, parking for its service facilities, and an easement to reach the rear of the site where the tower and modular equipment building will be housed. The proposed B.A.M.S. tower and auxiliary structure would be enclosed in an eight-foot chain link fence buffered by eight-foot white pines.

Plaintiffs applied for the required use variance and requisite site plan approval for construction of the 197–foot tower and supporting auxiliary structure. Hearings were held on January 8, 1992, and February 12, 1992, to consider the joint applicants' use variance for the proposed communications tower. At the latter meeting, the proposed variance was denied pursuant to a subsequent resolution adopted on March 10, 1992.

In the Board's final determination, it found that the 122–foot expansion of the nonconforming fire company tower was not an *inherently beneficial use* and that the site of the fire company's *already existing* 75–foot tower was not particularly well suited for B.A.M.S.'s proposed use. Invoking the controlling statute, *N.J.S.A.* 40:55D–70(d), the Board concluded that the B.A.M.S.'s proposed use did not meet the *positive criteria* set out in the statutory guidelines. In addition, the Board determined that the applicants failed to satisfy the *negative criteria by an enhanced standard of proof.*

## II. *Requirements for a Use Variance under N.J.S.A. 40:55D–70(d).*

■ Pursuant to *N.J.S.A.* 40:55D–70(d)(2), a use variance is required in order to *expand a nonconforming use.* Under *N.J.S.A.* 40:55D–70's statutory scheme, an applicant seeking to expand a nonconforming use must satisfy the following two criteria: "(1) that 'special reasons' exist for the variance [the "positive criteria"], and (2), that the variance "can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and the zoning ordinance [the "negative criteria"]." *Cerdel Constr. Co., Inc. v. East Hanover Tp.,* 86 *N.J.* 303, 307, 430 *A.2d* 925 (1981) (quoting *N.J.S.A.* 40:55D–70(d)). The statutory phrase "special reasons," used interchangeably with "positive criteria," has been generally construed quite broadly as "those criteria that promote the purpose of land use regulation and would promote the general welfare." *Anfuso v. Seeley,* 243 *N.J.Super.* 349, 370, 579 *A.2d* 817 (App.Div.1990). However, in cases where the use variance sought is for an *inherently beneficial use,* the positive criteria or special reasons requirement is impliedly satisfied and the applicant is required to satisfy only the negative criteria. *Sica v. Bd. of Adj. of the Tp. of Wall,* 127 *N.J.* 152, 165, 603 *A.2d* 30 (1992).

### A. *The Standard of Review.*

■ The review of the decision of a board of adjustment denying a use variance "begins with the recognition that the board's decision is presumptively valid, and is reversible only if arbitrary, capricious, and unreasonable." *Sica, supra,* 127 *N.J.* at 166–67, 603 *A.2d* 30. This presumption of validity is extended to boards of adjustment recognizing that they "possess special knowledge of local conditions and must be accorded wide latitude in the exercise of their discretion." *Id.* at 167, 603 *A.2d* 30. Reviewing courts should generally "defer to (the board's) judgement and its peculiar knowledge of local conditions so long as its decision is supported by the record and is not so arbitrary,

unreasonable or capricious as to amount to an abuse of discretion."
*Jayber, Inc. v. Mun. Council of the Tp. of W. Orange,* 238
*N.J.Super.* 165, 173, 569 *A.*2d 304 (App.Div.1990); *see also Com.
for a Rickel Alternative v. City of Linden,* 111 *N.J.* 192, 199, 543
*A.*2d 943 (1988); *Medici v. BPR Co.,* 107 *N.J.* 1, 526 *A.*2d 109
(1987).

 With a presumption of validity as a starting point, this
court must carefully scrutinize the record below. Such a review of
the record created by the Board during its evaluation of the
positive and negative criteria under *N.J.S.A.* 40:55D–70(d), reveals
that this deferential standard must give way. The record of the
proceedings before the Board is replete with evidence contradict-
ing the Board's findings. Therefore, the Board's denial of the use
variance constitutes a reversible abuse of discretion.

## B. *Positive Criteria and the Determination of Inherently Bene-
ficial Uses.*

The Board's determination that cellular communications is not
an inherently beneficial use permitted it to conclude that B.A.M.S.
had not satisfied *N.J.S.A.:*40:55D–70(d)(2)'s positive criteria. This
determination is greatly at odds with the increasing judicial recog-
nition of telecommunications as an inherently beneficial use.

 B.A.M.S., in support of its action in lieu of prerogative
writs, relied on two recent unpublished decisions involving appeals
from denials of use variances for cellular communications towers.
*Bell Atlantic Mobile Systems, Inc. v. The Bd. of Adj. of the Tp. of
Readington and the Tp. of Readington,* Law Div.Mdsx.Cty.Docket
No. L–0090–92, decided July 9, 1993, and *Nynex Mobile Commu-
nications v. The Hazlet Tp. Bd. of Adj.,* Law Div. Monmouth Cty.
Docket No. L–642–93, decided August 10, 1993. The trial courts
in *Nynex Mobile* and *Bell Atlantic Mobile* determined against
local board resolutions that cellular communications is an inher-
ently beneficial use, and, therefore by definition satisfies the

positive criteria of *N.J.S.A.* 40:55D–70(d)(2).[2] Both courts substantially relied for support of their positive evaluations of telecommunication variances on *Yahnel v. Board of Adjustment of the Bor. of Jamesburg,* 79 *N.J.Super.* 509, 192 *A.*2d 177 (App.Div. 1963), and *Alpine Tower v. The Mayor and Council of the Bor. of Alpine,* 231 *N.J.Super.* 239, 555 *A.*2d 657 (App.Div.1989).

The *Yahnel* case involved a requested variance for construction of a building required to service a telephone company wiring service center. Similarly, the *Alpine Tower* case concerned enlargement of an already existing communication center in an area not zoned for the applicant's proposed use.

In *Yahnel,* Judge Milton Conford evaluated the applicant's proposed use as follows: "Improved telephonic communications are obviously a subject matter of high relationship to the welfare of the entire community." 79 *N.J.Super.* at 518, 192 *A.*2d 177.

In the *Alpine Tower* decision, the court similarly reasoned that: "The regional public benefit derived from plaintiff's communication facilities and the need for proposed new buildings to house sensitive modern electronic equipment used in the facility provide additional grounds for finding of special reasons." 231 *N.J.Super.* at 239, 555 *A.*2d 657.

*Nynex Mobile* and *Bell Atlantic Mobile* closely track the rulings in *Yahnel* and *Alpine Tower* in that they uphold use variances for the primary purpose of promoting telephonic communications. *Alpine Tower,* while falling just short of finding that promoting telecommunications is inherently beneficial *as a matter of law,* provided ample support for this holding when it found that telecommunications is a regional public benefit providing grounds for a finding of "special reasons." *Id.* at 249, 555 *A.*2d 657.

The case law beginning with *Yahnel* and continuing through *Alpine Tower* spans thirty years of social evolution and represents

---

2 Although unpublished opinions do not provide legal authority (*R.*1:36–3), where the unpublished opinions essentially rely on published opinions, such as these do, they provide useful guidance.

the broadening of our society's conception of what constitutes an inherently beneficial use. The progression of these cases strongly suggests that when a proposed use variance promotes telecommunications, as proven by uncontroverted expert testimony, such use is *inherently beneficial as a matter of law.*[3]

The Board, without any evidentiary basis, concluded that mobile telephones were expensive devices primarily utilized by the affluent and, therefore, that cellular phone use did not represent a compelling local need. In paragraph nine of the Board's final resolution, it found as follows:

Cellular telephones are not listed among the uses classified as a public utility and are not regulated by the BPU. B.A.M.S. subscribers must possess the economic wherewithal sufficient to obtain, insure, maintain and operate a motor vehicle equipped with a cellular telephone device. Apart from the expenses associated with motor vehicle use, average subscriber costs, according to B.A.M.S., are in the neighborhood of $1,200.00–$1,500.00 per year. It is apparent to this Board that cellular is realistically, economically unavailable to a large segment of our population and is beyond the reach of low income persons. This is not an indication of a public utility designed to serve the general public.

The Board's unwillingness to recognize cellular communications as a beneficial use is indicative of its own limited view regarding the meaning of the *general public welfare* and what constitutes an inherently beneficial use. This narrow point of view was recently criticized by the Supreme Court in the course of reversing the denial of a use variance for a head trauma center:

Regional or ... local institutions generally recognized as serving the public welfare are too important to be prevented from locating on available, appropriate sites, subject to reasonable qualifications and safeguards, by the imposition of exclusionary or unnecessarily onerous municipal legislation enacted for the sake of

---

[3] In *Sica v. Bd. of Adj. of Tp. of Wall, supra,* 127 *N.J.* at 159, 603 *A.2d* 30, the Supreme Court cites the following as examples of inherently beneficial commercial uses: private, for-profit senior citizen congregate care facilities; a 120–bed nursing home; a private day-care nursery; and a tertiary sewage treatment plant to serve a commercial trailer park. Absent from this list are *Yahnel*'s telephone dial service station and *Alpine Tower*'s communication storage facility. However, later in *Sica,* the Court cites *Alpine Tower* and *Yahnel* as *"sufficiently beneficial"* to satisfy the positive criteria. *Supra,* 127 *N.J.* at 165, 603 *A.2d* 30 (emphasis added). "Sufficiently beneficial" is equivalent to "inherently beneficial" for purposes of impliedly satisfying the positive criteria.

preserving the established or proposed character of a community or some portion of it ... or to further some other equally *indefensible parochial interest.*

> [*Sica, supra,* 127 *N.J.* at 162, 603 *A.*2d 30 (emphasis added) (quoting *Roman Catholic Diocese of Newark v. Borough of Ho–Ho–Kus,* 47 *N.J.* 211, 220 *A.*2d 97 (1966) (concurring opinion).]

It is not difficult to imagine instances where access to cellular communications could mean the difference between life and death for an accident victim in need of immediate attention or numerous other situations where immediate communication is critical to safety.[4] The Board's denial of B.A.M.S.'s use variance is best characterized as the type of indefensible parochial interest criticized in *Sica.*

C. *The Inapplicability of Medici's Enhanced Proof to Beneficial Uses.*

■ The Board erroneously held B.A.M. to an enhanced standard of proof in reviewing the applicants' negative criteria testimony. An enhanced standard of proof is not required where an inherently beneficial use exists.

The Supreme Court in *Sica* clarified its earlier decision, *Medici v. BPR Co., supra,* 107 *N.J.* at 21, 526 *A.*2d 109, by clearly stating that an applicant for a use variance is *not required* to establish through *enhanced proof* that the variance sought is consistent with the intent and purpose of the zone plan when the proposed use is *inherently beneficial.* 127 *N.J.* at 162, 603 *A.*2d 30. Similarly, courts in both our Appellate and Law Divisions found *Medici*'s enhanced standard of proof inapplicable to inherently beneficial uses. *Jayber, Inc. v. Mun. Council of the Tp. of W. Orange, supra,* 238 *N.J.Super.* at 165, 569 *A.*2d 304 (construction of congregate care housing facility); *Homes of Hope, Inc. Bd. of Adj. of Mount Holly,* 236 *N.J.Super.* 584, 566 *A.*2d 575 (Law Div.1989) (conversion of single-family dwelling into low-income apartments).

---

4 This is precisely one of the benefits accruing to the Fire Company in that new alternatives to emergency communication are permitted by the expanded communications tower. Indeed, the Board explicitly recognized this in paragraph six of its final resolution of March 10, 1992.

In light of *Sica*, the Board's refusal to grant the use variance was premised on the flawed assumption that B.A.M.S. was required to establish through *enhanced proof* the avoidance of negative criteria.

D. *The Negative Criteria.*

B.A.M.S. produced substantial expert testimony regarding the effect of the proposed use on the township's zone plan. B.A.M.S. produced uncontroverted expert testimony in this regard that uses of a *low impact variety* will not adversely affect the surrounding community. B.A.M.S.'s testimony was credible and convincing that uses of a low-impact variety *do not generate traffic congestion, water contamination, septic stress, increased noise or other health related problems.*

The Board completely disregarded B.A.M.S.'s expert testimony regarding the lack of significant negative criteria and adopted the testimony opposing the tower which lacked an adequate and credible foundation. The Board's findings were not based on the record before it and clearly demonstrate that the Board's action was arbitrary, capricious and unreasonable.

The record of the hearings before the Board make it evident that the procedure utilized in denying the variance was entirely unreasonable. The most outspoken witnesses against the applicants' use variance, Mr. Hitchcock and Mr. Fritsche, had a direct financial stake in property neighboring the site of the tower. Such direct property interests seriously taint the validity of the negative impact evidence offered by these two witnesses.

The Board's determination in paragraph 8 of its final resolution that Fritsche's negative impact testimony was more detailed, knowledgeable and authoritative than B.A.M.S.'s comparable testimony was not supported by the record. Fritsche admitted that he was not an authority on the matters he testified to and that he merely recited what he believed to be resolutions of similar use variance disputes. Fritsche testified regarding the proposed tower's lighting requirements without any specific knowledge or foun-

dation. Fritsche's purported expertise in the field of aviation evidences his lack of credibility and the inappropriateness of his opinions. The applicant's expert provided a significant foundation for his testimony regarding lighting requirements for communications towers of varying heights. In addition, B.A.M.S.'s planning expert described the area as principally rural and agricultural with scattered development on largely open land. This assessment was readily confirmed by the photographs submitted into evidence.

It is significant that the subject property is bordered to the south by a ninety-one-acre tract, to the east by a twenty-acre tract and bordering each of those properties is a seventy-six-acre tract and a fourteen-acre tract. Directly across the road from the site in question is a fifty-two-acre tract, a twenty-two-acre tract, and a fifty-four-acre tract. Without question, the subject site is sparsely developed and largely rural.

In paragraph 15 of its resolution (emphasis added), the Board stated that:

... The 197 foot lattice tower would adversely impact the surrounding AR–2 Zone to a very substantial degree, *would add a second use to an already developed property, and would conflict with the character of the surrounding area and the intent of the AR–2 Zone.* Given the *visual nuisance characteristics* of the tower and the potential adverse affects of the existing aeronautical facility located across the road, the applicant has failed to demonstrate that the proposed use does not constitute a substantial detriment to the public.

In the next paragraph of the resolution (emphasis added), the Board found that:

... The proposed 197–foot tower, painted red and white and bearing flashing aircraft lights, unscreened by vegetation or topographical features in a relatively flat Baptistown area *would constitute a significant visual intrusion* which would significantly impair the rural character of the AR–2 Zone.

It is obvious that the Board based its determination on what it termed *visual nuisance.* There was no credible evidence presented supporting the Board's determination that the 197–foot tower would adversely impact the community. The Board's final deter-

mination that the proposed tower would constitute a significant visual intrusion lacked a credible testimonial foundation. It is very difficult to imagine how the proposed replacement tower could create a significant nuisance to this largely undeveloped and uninhabited area. Replacing the 75–foot antennae tower in the rear of the fire house with a 197–foot tower (122 additional feet) is at most a *minimal* intrusion on the surrounding community. Considered in its entirety, the record does not contain any other negative criteria associated with the construction of the 197–foot tower. For instance, no testimony was presented regarding diminished property values resulting from the proposed tower.

Additional testimony presented to the Board in opposition to the tower's construction was greatly conflicted as to whether the subject area should be characterized as rural or commercial because of the activity associated with a nearby aeronautical facility. This inconsistent testimony was never adequately addressed by the Board as mandated by *N.J.S.A.* 40:55D–10(g). *See also Harrington Glen, Inc. v. Leonia Bd. of Adjustment,* 52 *N.J.* 22, 28, 243 *A*.2d 233 (1968).

■ Further evidence of the arbitrary, capricious and unreasonable nature of the Board's action can be found in the fact that this use variance seeks only to *expand an already existing nonconforming use.* Applications for expansions of existing nonconforming uses are viewed with "greater liberality than applications for variances to allow *new* uses, because they are 'less likely to involve substantial impairment of the zoning plan than ... creation of a *wholly new use....*" *Alpine Tower, supra,* 231 *N.J.Super.* at 248, 555 *A*.2d 657 (quoting *Grundlehner v. Dangler,* 29 *N.J.* 256, 269, 148 *A*.2d 806 (1959)). The additional benefits accruing to the Kingwood Township Fire Company from the expanded replacement tower further compound the unreasonableness of the Board's denial. Considering all of the above factors, the Board's denial of the applicants' use variance is particularly egregious.

### III. *Balancing the Beneficial Use with the Negative Criteria: The Four Prongs of Sica.*[5]

After determining whether the proposed use is inherently beneficial and identifying the negative criteria without an *enhanced* standard of proof, *Sica* suggests the following four-prong procedure as a general guide to municipal boards when balancing the positive and negative criteria: (1) "the board should identify the public interest at stake," (2) "the Board should identify the detrimental effect that will ensue from the grant of the variance," (3) in appropriate situations, "the local board may reduce the detrimental effect by imposing reasonable conditions on the use," and (4) "the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public." [6] *Supra,* 127 *N.J.* at 165–166, 603 *A.*2d 30. *Sica* clearly cautions that a Board may only exclude inherently beneficial uses when the negative impact of the proposed use is *significant. Id.* at 166, 603 *A.*2d 30.

Applying this four pronged procedure to the case at bar, the Court finds as follows: (1) the public interest at stake is significant: · cellular communications advance the public interest by facilitating wireless communication for business, personal and emergency purposes and enhance productivity by converting oth-

---

[5] The Board's Final Resolution denying the use variance was issued on March 10, 1992. *Sica* was decided on March 19, 1992. Although the Board was acting pre-*Sica,* the underpinnings of *Sica*'s four-prong approach can be found in decisions such as *Homes of Hope, supra,* 236 *N.J.Super.* at 594, 566 *A.*2d 575. *Medici, supra,* 107 *N.J.* at 22. n. 12, 526 *A.*2d 109; and *Yahnel, supra,* 79 *N.J.Super.* at 519, 192 *A.*2d 177.

[6] Although courts prior to *Sica* were divided as to whether *N.J.S.A.* 40:55D–70(d) required balancing the negative and positive criteria in the case of inherently beneficial use variances, *Sica* resolved this dispute in the affirmative.

*Sica* stated that "the need for balancing is implicit in the statutory requirement that the grant of a variance must be 'without substantial detriment to the public good' and that [f]airly read ... (this) necessitates a balancing of positive and negative criteria." 127 *N.J.* at 164, 603 *A.*2d 30 (citations omitted).

erwise idle travel time to constructive ends; (2) the detrimental effect of the antennae tower is minimal on the surrounding rural environment; (3) reasonable conditions were self-imposed by the applicant such as precluding strobe lights on the tower and planting eight foot pines to buffer the enclosed facilities; and (4) weighing the positive and negative criteria, the outcome of this balancing test weighs heavily in favor of permitting an inherently beneficial use.[7]

On the record below, there are no significant negative criteria to counterbalance the tower's clear beneficial use. The expanded lattice antennae tower requires for auxiliary support an unstaffed, fenced and landscaped building visited twice a month for several hours. Such a sedentary block house buffered by landscaping is unobtrusive and causes no appreciable increase in traffic congestion, noise or pollution to the surrounding community.[8]

IV. *Conclusion.*

B.A.M.S.'s use variance can be granted without detracting from the zoning ordinance or overall zone plan. The Board of Adjustment's negative evaluation of the applicants' use variance was arbitrary, capricious and unreasonable. Consequently, the determination of the Board of Adjustment of the Township of Kingwood is reversed and it is directed that the use variance, including the construction of the 197–foot tower, be granted.

---

[7] *Sica* clearly instructs that a Board may only exclude inherently beneficial uses when the negative impact of the proposed use is *significant.* 127 *N.J.* at 166, 603 *A.*2d 30.

[8] It is unnecessary to remand this matter to the Board for further findings. The record is closed. The lack of significant negative criteria to weigh against the inherently beneficial use renders such a remand pointless.