30 A.3d 348 (2011)
423 N.J. Super. 49
KANE PROPERTIES, L.L.C., Plaintiff-Appellant,
v.
CITY OF HOBOKEN, New Jersey and City of Hoboken City Council, Defendants-Respondents.
Docket No. A-3903-10T4
Superior Court of New Jersey, Appellate Division.
Argued October 12, 2011.
Decided November 16, 2011.
*349 Arnold K. Mytelka argued the cause for appellant (Kraemer Burns, P.A., attorneys; Mr. Mytelka and John A. Avery, Springfield, on the brief).
Edward J. Buzak, Montville, argued the cause for respondents (The Buzak Law Group, L.L.C., attorneys; Mr. Buzak and Susan L. Crawford, on the brief).
*350 Before Judges PAYNE, REISNER and HAYDEN.
The opinion of the court was delivered by
REISNER, J.A.D.
Plaintiff Kane Properties, L.L.C., appeals from a March 3, 2011 order of the Law Division, affirming the decision of the Hoboken City Council reversing variances granted to plaintiff by the municipal zoning board.
To summarize, plaintiff sought (d) variances to build a twelve-story seventy-two-unit residential building with a parking garage and an on-premises day care center, in an I-2 industrial zone. After extensive hearings, the Hoboken Board of Adjustment (Board) granted the variances. On a challenge filed by Skyline Condominium Association (Skyline), which operates a nearby fifteen-story residential building, the City Council (Council) disapproved the Board's grant of variances for residential use, and for exceeding floor area, story height and building height restrictions. The Council approved the variance for a day care center, and that approval is not at issue here. Plaintiff then filed a Law Division action in lieu of prerogative writs, challenging the Council's decision.
Reiterating arguments it unsuccessfully raised in the Law Division, plaintiff first contends that the Council's decision was tainted by the participation of the City's recently-appointed Corporation Counsel, an attorney who had previously represented Skyline in the Board hearings. In the alternative, plaintiff argues that the Council's decision was arbitrary and capricious because it was not supported by the record evidence. At oral argument, plaintiff's appellate counsel urged that, even if we were to rule for plaintiff on the conflict issue, a remand to the Council is unnecessary because the evidence supporting the variance is so one-sided in its favor that plaintiff is entitled to variance relief as a matter of law.
Based on this record, we cannot agree that plaintiff was necessarily entitled to prevail on its application, but we conclude that the Corporation Counsel's participation, despite a clear conflict of interest, requires that the matter be remanded to the Council for reconsideration. Accordingly, we reverse the March 3, 2011 Law Division order on appeal, vacate the May 5, 2010 City Council resolution, and remand this matter to the Council for further proceedings consistent with this opinion.

I
This was the most pertinent evidence introduced at the Board hearing. The property is located in an I-2 industrial zone, in which residential uses are not permitted.[1] However, following the "gentrification" of Hoboken and neighboring Jersey City, there are in fact many high-rise residential buildings in the zone and just across the municipal border in Jersey City.
The property owner, Anthony Rey, testified about the problems he had in running a meat and cheese wholesaling operation in an area that had significant non-conforming residential uses. He alleged that his residential neighbors, particularly Skyline, drove his business out of the area by constantly complaining about noise and fumes from the refrigerated delivery trucks that *351 arrived at his cold-storage warehouse. According to Rey, local law enforcement authorities repeatedly issued citations to Rey and his suppliers, as a result of which, in 2001, he moved his operation to another city. The property was still vacant and boarded up at the time of the hearing in 2009.
According to Rey, he was unable to sell or rent the Hoboken site to any other industrial user, because they were all afraid that they would likewise be the subject of complaints from the residential neighbors. However, on cross-examination, he was unable to provide specifics about when and to whom he had attempted to sell the property. He also admitted that he had never listed the property with a broker for either sale or lease. He never sought tax relief from the City because the building was empty and unused. He further conceded that although he was threatened with "stiff penalties for failure to comply," he "wasn't fined." Beyond a couple of letters sent in 1992, he did not direct his attorney to take action in response to the threatened enforcement actions. Nor did he ever reach out to his neighbors at Skyline to try to resolve their concerns.
On cross-examination, he denied needing to move his operation in order to obtain more space. But he admitted that when he moved his operation to North Bergen in 2001, he also merged his company with a second company, with which he had been in negotiations since 1998. The site in North Bergen was larger than the one in Hoboken.
At the time of the hearing, the property was under contract to buyers who conditioned their purchase on obtaining variances for residential construction. Asked how he finally happened to find a buyer for his property, Rey explained that after many years, he agreed to sell to someone who worked at the fire station across the street from the property. He claimed he did not use a broker and arrived at a price without getting an appraisal. In response to questions from the Board, Rey admitted he never thought of trying to sell the property to anyone who might use it for retail purposes, or other non-warehouse uses allowed by the zoning ordinance. He wanted to sell to a similar user who would also buy the freezers and other equipment in the building.
The applicant also presented expert testimony from Kenneth Ochab, a professional planner. He offered several reasons in support of granting the (d) variances. First, he opined that the property had been zoned into inutility, because the industrial uses permitted in the I-2 zone were no longer economically viable in that area of Hoboken. Second, the property was blighted and underutilized, and the proposed development would remedy that situation. He also opined that the dominant use in the surrounding Hoboken neighborhood, and the adjacent Jersey City neighborhood, was high-rise residential buildings, and the proposed project was consistent with that use. The addition of an attractive residential high-rise, in place of a boarded-up old warehouse, would improve the visual environment along Newark Street, which was one of the gateways into Hoboken. Ochab further testified that the proposed development was consistent with the master plans of both Hoboken and Jersey City and, finally, that it was consistent with the intent and purpose of the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -112. In the latter regard, he noted that building urban high-rise housing was consistent with the state development policy to reduce suburban sprawl and conserve open space.
On cross-examination, Ochab agreed that the Hoboken master plan, which recommended *352 residential use for this zone, was last updated in 2004, and the City Council had not adopted it. He admitted that the I-2 zone permitted retail uses, but he insisted that the site was too small for a "substantial commercial or retail facility." He also opined that there were food stores and a strip mall nearby that "already met the retail demand" in the area. He further opined that a small retail store with off-street parking would encounter the same objections from neighbors about "truck deliveries and traffic and noise" that Rey experienced.
Despite conceding that the zoning allowed a comprehensive list of retail uses, including liquor stores, drive-through dry cleaners, and beauty salons, Ochab insisted that none of those businesses could be viable at that location. He also testified that "[w]hen you have an emerging development pattern, such as residential, it stands to reason that continuation of that pattern is good planning, and that other uses, which may not be as compatible is not good planning." He admitted that the Southwest District Redevelopment Study, on which he partly based his opinions, was adopted by the local planning board but not by the City Council and did not result in a redevelopment plan.
On further cross-examination by the Board's professional planner, Ochab clarified that the proposed 2004 master plan did not recommend creation of a residential district. Rather it recommended that residential housing be permitted as a "conditional use" in what it recommended as an industrial transition (IT) district. Residential housing would be permitted conditioned on its being located next to a public park or cultural facility.
Dean Marchetto, the building's architect, also testified. Among other things, he explained that he designed the building to create a safe sidewalk in front, as part of a long-term effort to encourage "continued pedestrian activity along Newark Street." He also explained that the height of the building was a function of the number of units the developer wanted to build, and the need for on-premises parking.
The objector presented testimony from Jason Kasler, a professional planner, who opined that the applicant had not met the criteria for a (d) variance. Addressing the claim that the property had been zoned into inutility, he noted there was no proof that, for example, the site could not be used for office space. He also testified that the owner had made no reasonable effort to market the property for a permissible use, and there was no proof that the property could not be used for some permissible purpose, even if it could not be used for its most profitable purpose, i.e., housing. He also testified that even if the master plan had been adopted, the proposed twelve-story residential building would be inconsistent with that plan, because it was six stories taller than the master plan would allow and was not located next to any public open space. Further, given that Hoboken was already the "ninth densest incorporated place in the country" there was no basis to conclude that more "intensive" residential development would be beneficial to the City.
On cross-examination, Kasler admitted that the primary purpose of the I-2 zone was to "establish appropriate standards and uses for rail and other transportation-related commercial and light industrial activities." Other than the New Jersey Transit Rail yard, there were no longer any rail-related activities, and no new industrial activity, in the zone. He agreed that "industrial uses are not harmonious with the current land use." He conceded that he did not know if the property was actually marketable for a non-residential use, but asserted that it was the applicant's *353 burden to produce evidence on that issue. He also noted that the zoning ordinance permitted many non-industrial uses, such as retail and professional offices.
The Board also heard testimony from members of the public, including residents of Skyline, who complained that a twelve-story building would block their views of New York City or the Hudson River.
In his remarks, Skyline's attorney, Michael Kates, Esq., told the Board that his clients would not object to the project if it were six stories instead of twelve stories. Kates agreed that the existing zoning was "stale" and needed to be updated, but he asserted that even the master plan, if adopted, would not have allowed this project. In their comments, several Board members echoed his criticism of the City Council for failing to update the zoning ordinance.
In a lengthy Resolution dated December 15, 2009, the Board credited the testimony of the applicant's witnesses and did not credit the testimony of the objector's witness. They specifically adopted the reasons to which Ochab testified, justifying the need to permit residential development on the site. They agreed that the existing zoning was outdated and would result in the property being zoned into inutility. The Board also found that the statutory negative criteria were met because the project was not substantially detrimental to the public good nor did it substantially impair the intent and purpose of the zoning plan. The Board found no substantial detriment to the public good because (1) the project would have no negative impacts on surrounding industrial uses, parking lots or residential uses; (2) the project allowed adequate light and air to residential developments; (3) there would be no demand for off-street parking because the building incorporated a parking garage; and (4) the building was aesthetically pleasing.
The Board concluded that the project would not substantially impair the intent and purpose of the zoning plan because (a) the master plan designated the area to transition from I-2 to residential use (b) the I-2 zone use for the area was obsolete; and (c) many buildings in the area needed to be redeveloped and the project redeveloped the property "consistent with the dominant residential development in that portion of Hoboken."
Skyline filed an appeal with the City Council, seeking to overturn the Board's decision. See N.J.S.A. 40:55D-17a. Two weeks after the Board issued its decision, Skyline's attorney, Michael Kates, Esq., was appointed Corporation Counsel for the City of Hoboken, thus becoming the City Council's legal advisor. He remained in that position for a year, overlapping the time when the Council was considering the challenge to the Board's decision.
In response to our question at oral argument, the City's attorney advised us that although traditionally the Corporation Counsel was a full-time position, the City made an exception for Kates by allowing him to work in that position part-time while remaining a partner at his law firm. When Kates became Corporation Counsel, an attorney from a different law firm took over the representation of Skyline in this matter. Hence, Kates' law firm did not represent Skyline before the Council. The record does not reflect whether Kates' firm continued to represent Skyline in other legal matters. However, there is no dispute that when the City Council heard Skyline's challenge, Kates was simultaneously employed as the Council's legal advisor and as a partner in the law firm that had previously represented one of the litigants before the Council.
*354 On January 11, 2010, in his capacity as Corporation Counsel, Kates signed a form letter confirming the filing of the Skyline appeal and the scheduled hearing date and asking the parties to identify any possible conflict issues. In response, plaintiff's attorney sent a letter on January 13, objecting to Kates' advising the Council and asking whether he intended to recuse himself. By letter dated January 22, 2010, Edward J. Buzak, Esq. confirmed that his firm had been retained to advise the Council in the Skyline appeal. On February 5, 2010, after recusing himself, Kates sent the Council a memorandum containing generic advice about how to handle zoning appeals in general. The memo did not refer to the Skyline appeal but referred specifically to a different appeal involving an applicant named Tumpson.
On March 16, 2010, Buzak sent the City Council a letter and his own advice memorandum addressing the handling of the Skyline appeal. However, he also included, and his letter referenced, a copy of Kates' general advice memo. The March 16 letter noted that there was "some overlap in the two" memos, and indicated that "we are and will be prepared to answer any questions that may arise from the content of these memoranda." Kates was "cc'd" on the letter, along with all counsel on the appeal. In response, plaintiff's attorney sent Buzak a letter on March 17 objecting to the Council receiving any advice from Kates in the matter, directly or indirectly through Buzak, because of Kates' conflict of interest. He also took issue with the substance of Kates' advice memo.
At the Council's hearing on March 24, 2010, three zoning appeals were on the agenda, including the Skyline appeal. The Council announced that it would only hear the Skyline appeal that evening. Although Buzak referred briefly to Kates' advice memo, he presented his own advice to the Council at the meeting. Kates was not present. At the meeting, Skyline's attorney made no objection to Buzak's passing reference to Kates' memo, nor did he contend that Buzak was tainted in any way from advising the City Council.
After hearing extensive argument from all counsel, including an attorney for the Board, and after lengthy public deliberation, a majority of the Council voted to deny all of the variances, except for the day care center. The Council's decision was memorialized in a resolution drafted by Buzak. In a letter to the City Clerk dated April 28, 2010, Buzak transmitted a revised version of the resolution "[in] accordance with instructions received." His letter "cc'd" counsel for the applicant, Skyline, and the Board. Kates was not copied on the letter.
The Council met on May 5, 2010, to consider several items of business, including adoption of the resolution on the Skyline appeal. It is clear from the transcript of the meeting that the Council members had asked Buzak to make changes to the resolution, and the members discussed those changes at the meeting. But Buzak was not there to advise them. Instead, Kates was at the meeting. He did not advise the Council on the substance of the changes to the resolution. However, one of the Council members asked Kates whether those who had been in the minority in voting to approve the application should vote on the changes to the resolution. Kates advised that those in the minority "are simply not called on the vote" and "just those who voted with the majority" should vote on the changes to the resolution. After the majority voted, another Council member asked whether the Council needed to vote on the "granting of the other variance." Kates responded, "No. [Y]ou are memorializing both votes *355 when you took that vote." When the resolution was finalized on May 5, 2010, it was attested by the City Clerk and signed as "Approved" by "Michael B. Kates, Corporation Counsel."
In substance, the resolution recited the Council majority's conclusions that neither Rey's testimony nor that of the applicant's experts established that the property could not be marketed and used for a purpose consistent with the existing zoning. The Council found that Rey had made no meaningful effort to market the property and that Ochab's testimony was conclusory and "not supported by any related facts." The Council noted the presence of other retail uses not far away, and was not convinced that the property could not be used for additional retail uses or office space. The Council found that "[w]hile those uses may not be as economically advantageous to the Applicant, an Applicant is not entitled to be able to make the most profitable use of its property." The Council also did not find that the site was particularly suitable for the proposed use because it found nothing "in the record to demonstrate any uniqueness to this parcel which would make it more suitable for residential use than other parcels in the I-2 Zone," half of which were being used in ways that conformed with the I-2 zoning.
The Council noted that the applicant did not explain why the same on-premises parking arrangement planned for residential use could not work with an office building or retail store, and the Council found that an attractive, environmentally friendly commercial building would make an equally desirable public introduction to the City's gateway. Significantly, the Council indicated that its failure to modify the zoning to include residential uses was intentional and not a matter of inaction or oversight. In other words, its policy views as to the proper development of the area differed from those of the Board.
Kane filed an action in lieu of prerogative writs challenging the Council's decision, contending that the decision was unsupported by the evidence and was tainted by Kates' participation.

II
We begin our legal analysis by considering the applicable law concerning (d) variances and the standard of review of the Council's decision on the variances. A board of adjustment has the power "[i]n particular cases for special reasons, [to] grant a variance to allow departure from regulations ... to permit:"
(1) a use or principal structure in a district restricted against such use or principal structure ...
(4) an increase in the permitted floor area ratio ... or
(6) a height of a principal structure which exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure.
[N.J.S.A. 40:55D-70(d).]
Such a variance may be granted, upon finding that: (1) "special reasons" exist for granting the variance, and (2) the variance "can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70(d); Burbridge v. Mine Hill Twp., 117 N.J. 376, 386-87, 568 A.2d 527 (1990); see Kohl v. Mayor of Fair Lawn, 50 N.J. 268, 276, 234 A.2d 385 (1967). The former are the positive criteria and the latter are the negative criteria. Sica v. Bd. of Ajustment, 127 N.J. 152, 156, 603 A.2d 30 (1992). The grant of a(d) variance is the exception not the rule because legislative policy favors land use planning through ordinances not *356 variances. Funeral Home Mgmt. v. Basralian, 319 N.J.Super. 200, 207, 725 A.2d 64 (App.Div.1999).
Generally, three categories of circumstances constitute "special reasons": (1) where the proposed use (e.g., schools, hospitals) inherently serves the public good, see Sica, supra, 127 N.J. at 160, 603 A.2d 30; (2) where a zoning restriction imposes an "undue hardship" on the property owner, see Medici v. BPR Co., 107 N.J. 1, 17 n. 9, 526 A.2d 109 (1987); and (3) where the use serves the general welfare because "the proposed site is particularly suitable for the proposed use." Id. at 4, 526 A.2d 109. "Special reasons" also may be found by considering the purposes of the Municipal Land Use Law (MLUL). Burbridge, supra, 117 N.J. at 386, 568 A.2d 527. It is the applicant's burden to show the existence of "special reasons" justifying the grant of a variance. Chirichello v. Zoning Bd. of Adjustment, 78 N.J. 544, 559-60, 397 A.2d 646 (1979).
"Undue hardship" requires a showing that "no effective use can be made of the property in the event the variance is denied." Commons v. Westwood Zoning Bd. of Adjustment, 81 N.J. 597, 605, 410 A.2d 1138 (1980). A property "owner is not entitled to have his property zoned for its most profitable use." Bow & Arrow Manor Inc. v. Town of West Orange, 63 N.J. 335, 350, 307 A.2d 563 (1973). However, land zoned to preclude any economically feasible use is considered to place an undue burden on the owner, sufficient to require grant of a(d) variance. Medici, supra, 107 N.J. at 17 n. 9, 526 A.2d 109.
Generally, "[a] local zoning determination will be set aside only when it is arbitrary, capricious or unreasonable." Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965). However, when a governing body reviews an appeal from a zoning board's decision, "the governing body is to have authority to make a de novo review of the record established before the board and reach its own decision in the matter subject only to the requirement that its findings and conclusions are supported by the record." Evesham Twp. Zoning Bd. of Adjustment v. Evesham Twp., 86 N.J. 295, 301, 430 A.2d 922 (1981).
When the governing body overturns a zoning board's grant of a variance, the action of the governing body, and not the zoning board, is given the presumption of validity, and should not be overturned unless found to be so arbitrary as to amount to an abuse of discretion. Jayber, Inc. v. Mun. Council of West Orange, 238 N.J.Super. 165, 173, 569 A.2d 304 (App. Div.), certif. denied, 122 N.J. 142, 584 A.2d 214, 215 (1990).
In considering the issues before us, we are mindful of our obligation to accord the action of the governing bodynot the board of adjustmentthe presumption of validity and to defer to its judgment and its peculiar knowledge of local conditions so long as its decision is supported by the record and is not so arbitrary, unreasonable or capricious as to amount to an abuse of discretion. Com. for a Rickel Alt. v. City of Linden, 111 N.J. 192, 199 [543 A.2d 943] (1988); Medici v. BPR Co., 107 N.J. 1 [526 A.2d 109] (1987); Evesham Twp. [Zoning] Bd. of Adjustment v. Evesham Twp., 86 N.J. 295 [430 A.2d 922] (1981).
[Ibid.]
Judged by those standards, and in light of this record, we cannot conclude that plaintiff was entitled to prevail on its variance application as a matter of law. The case presents a classic policy dispute between the Board and the Council over the appropriate development of this zoning district. Each agency's decision turned as *357 well on its assessment of witness testimony.
The Board focused on what Rey and Ochab said in their testimony about the difficulty of developing the property in a manner consistent with the existing zoning. The Council largely focused on what was missing from their testimony, particularly Rey's failure even to attempt to market the property for anything other than industrial warehouse use, and Ochab's failure to explain to the Council's satisfaction why the property could not be used for retail or other non-industrial commercial purposes. Similarly, the Board viewed the zoning ordinance as "stale" and outdated in failing to incorporate residential uses as permitted, while the Council viewed the Board as arrogating its zoning powers and acting inconsistent with the Council's intentional decision not to permit residential uses in the zone.
Given our deferential standard of review, and the particularly strong deference due a decision to deny rather than to grant a(d) variance, we would ordinarily be inclined to affirm the Council's decision, which is supported by record evidence. See Funeral Home Mgmt., supra, 319 N.J.Super. at 208, 725 A.2d 64. However, that deference is not due if the Council's proceedings were tainted by conflict of interest. Thus, we turn to plaintiff's arguments concerning Kates' participation in this matter. We review the trial court's legal construction of the conflict issue de novo. See City of Atlantic City v. Trupos, 201 N.J. 447, 463, 992 A.2d 762 (2010).
First, Kates indisputably had a conflict of interest. Having represented Skyline in the Board proceedings, he could not ethically provide the Council with legal advice concerning Skyline's appeal of the Board's decision. See RPC 1.11(d)(2)(i) (a government attorney may not participate in a matter "in which the lawyer participated personally and substantially while in private practice"). That is why Kates recused himself and the Council retained Buzak to provide advice on the appeal.
However, despite Kates having recused himself, the Council proceedings did include his participation, directly and indirectly: first, Buzak sent Kates' advice memo to the Council as part of his own advice on handling appeals; second, the Council chose to vote on the resolution at a meeting where Buzak was not present to advise them and Kates was present; third, at that meeting, Kates provided the Council some procedural advice concerning their vote on the resolution denying the variances; and fourth, Kates signed the resolution.
The essential question we must answer is whether, in the mind of a reasonable citizen fairly acquainted with the facts, this scenario would create an appearance of improper influence. Or, as the Court put it in addressing a judge's possible appearance of conflict: "Would a reasonable, fully informed person have doubts about the judge's impartiality?" DeNike v. Cupo, 196 N.J. 502, 517, 958 A.2d 446 (2008). We also consider that, in judging the activities of municipal governing bodies, the appearance of impropriety is a legitimate concern. See Randolph v. City of Brigantine Planning Bd., 405 N.J.Super. 215, 231, 963 A.2d 1224 (App.Div.2009).[2] The Local Government Ethics Law, N.J.S.A. *358 40A:9-22.1 to -22.25, also recites the Legislature's concern to maintain "the public's confidence in the integrity of its elected and appointed representatives." N.J.S.A. 40A:9-22.2b.
In approaching the conflict issue, we focus on the Council as decision-maker, rather than on Kates as its attorney. The question is whether, in this situation, a municipal decision-maker that receives advice, directly or indirectly, from an attorney with a conflict of interest, and that allows the attorney to participate in a Council meeting at which he should not even have been present, taints its resulting decision. On this factual record, we are constrained to answer in the affirmative.
In so deciding, we are not holding that any ethical lapse, however unintentional and de minimus, will void the Council's otherwise well-considered good faith vote on a zoning application. See Szoke v. Zoning Bd. of Adjustment, 260 N.J.Super. 341, 343-45, 616 A.2d 942 (App.Div.1992). We consider a number of factors. In this case, the Council was voting on a matter that conceivably could have gone either way, depending on how the Council weighed the testimony, and depending on the Council's policy views. Further, all participants even the objector's attorneyhad agreed during the Board hearings that the zoning was outdated. Reasonable citizens looking at this area of the City, with its many residential high-rises and its obsolete industrial buildings, might believe that the zoning was obsolete and might also suspect that the reason it was not being updated was to require residential developers to apply for variances and to reserve that relief for the politically well-connected. We are by no means implying that we subscribe to that view. But public skepticism about the zoning process is one of the dangers inherent in allowing a zoning ordinance to fall into obsolescence.
That situation also multiplies exponentially the extent to which any ethical lapse can undermine public confidence in the Council's decision on a variance appeal. In this case, Skyline was the objector, and Skyline's former attorney was the Corporation Counsel. That scenario alone would give any reasonable citizen cause for concern. As our Supreme Court observed decades ago:
[T]he subject of land development is one in which the likelihood of transactions with a municipality and the room for public misunderstanding are so great that a member of the bar should not represent a developer operating in a municipality in which the member of the bar is the municipal attorney or the holder of any other municipal office of apparent influence.
[In re A. and B., 44 N.J. 331, 334, 209 A.2d 101 (1965) (emphasis added).]
The Court further observed that an attorney having such a conflict must "withdraw completely from representing both the municipality or agency and the private client with respect to such matter." Ibid. (emphasis added). Moreover, we have recognized the considerable influence public attorneys have over their municipal clients:
An attorney advising a public body wields considerable power and influence by virtue of his ability and opportunity to interpret the law and advise on legal matters.
The force of his influence is subtle and pervasive.
[Lafayette Twp. v. Bd. of Chosen Freeholders, 208 N.J.Super. 468, 474, 506 A.2d 359 (App.Div. 1986).]
Kates should have been absolutely and completely screened from this application. No advice with his name on it should have gone to the Council. Instead of sending the Council a copy of Kates' advice memo, *359 however generic it was, Buzak should have created his own advice memo incorporating all of the advice he believed correct and necessary. Kates should not have been in the room when the Council was voting on the resolution, and he certainly should not have given any advice about it, procedural or otherwise. If Buzak was not available for that meeting, the Council should have considered the resolution at a separate meeting, as it did when it held the hearing on the application. Finally, Kates should not have signed the resolution.
All of these factors, taken together, lead us to conclude that the Council's May 5, 2010 resolution must be vacated and this matter remanded to the Council for reconsideration ab initio. See Randolph, supra, 405 N.J.Super. at 232, 963 A.2d 1224; Haggerty v. Red Bank Borough Zoning Bd. of Adjustment, 385 N.J.Super. 501, 517, 897 A.2d 1094 (App.Div.2006). To be clear, we are not requiring new evidentiary hearings; the evidentiary record was created before the Board in hearings untainted by any conflict. See N.J.S.A. 40:55D-17a (the governing body must decide the appeal "only upon the record established before the board of adjustment"). However, the Council, as currently constituted, must reconsider that record, allow new oral arguments, and deliberate and decide the appeal as though they had never considered it before.[3]
We therefore reverse the March 3, 2011 Law Division order and remand this matter to the Hoboken City Council for further proceedings consistent with this opinion. In light of our disposition of this appeal, we do not address the parties' additional appellate contentions, including their arguments about the floor area ratio and height variances. Apart from the approval for the childcare center, which is no longer at issue, the Council must consider anew all of the variances that are within its jurisdiction.
Reversed and remanded.
NOTES
[1] The I-2 zoning permits food processing and related storage and distribution; manufacturing, processing or fabricating operations; retail business or services; public buildings and uses such as equipment garages, parking facilities, parks and playgrounds; and cell phone towers.
[2] Contrary to the trial judge's opinion, it is irrelevant that the Rules of Professional Conduct no longer address the appearance of impropriety. See Atlantic City v. Trupos, supra, 201 N.J. at 464, 992 A.2d 762. We are not deciding whether Kates had a disqualifying conflict of interest. We are deciding whether his participation, despite his undoubted conflict of interest, created the appearance of impropriety in the Council proceedings.
[3] We understand that Kates is no longer the Corporation Counsel. To avoid any possible misunderstanding, if any of his advice memos are still in use, the current Corporation Counsel should not refer to them or provide them to the Council in connection with the proceedings on remand.