*Opposed*—None.

68 A.3d 1274

KANE PROPERTIES, LLC, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. CITY OF HOBOKEN, NEW JERSEY AND CITY OF HOBOKEN CITY COUNCIL, DEFENDANTS–RESPONDENTS AND CROSS–APPELLANTS.

Argued February 26, 2013—Decided June 26, 2013.

*Arnold K. Mytelka,* argued the cause for appellant and cross-respondent (*Kraemer Burns,* attorneys; *Mr. Mytelka* and *John A. Avery,* on the briefs).

*Edward J. Buzak,* argued the cause for respondents and cross-appellants (*The Buzak Law Group,* attorneys; *Mr. Buzak* and *Susan L. Crawford,* on the briefs).

Justice HOENS delivered the opinion of the Court.

The matter before this Court relates to the claim of a property owner who successfully sought a use variance before the local Zoning Board, only to see that grant of relief reversed by the municipality's governing body. Believing that the decision of the governing body was tainted because one of the municipal attorneys who participated in the governing body's proceedings had represented the principal objector to the project before the Zoning Board, the property owner filed a complaint to commence an action in lieu of prerogative writs.

In that proceeding, the trial court agreed that the municipal attorney had a conflict of interest but found no evidence that it had affected the decision of the governing body. As a result, the trial court conducted its de novo review of the decision of the governing body and, concluding that it was not arbitrary, capricious or unreasonable, let it stand.

The property owner, still aggrieved, next pursued its appellate remedies. The Appellate Division first found that although the municipal attorney had recognized that his prior representation of the objector created a conflict of interest and had announced that he would recuse himself from the proceedings before the governing body, his recusal was not complete. Furthermore, the appellate panel concluded that, because the attorney had participated in certain aspects of the proceedings before the governing body, the attorney's conflict of interest had tainted the governing body's decision. Disagreeing with the trial court's view that the property owner was required to demonstrate that the attorney's involvement had an actual effect on the governing body's decision, and relying instead on the appearance of impropriety standard, the Appellate Division concluded that the governing body's decision could not be sustained. The appellate panel therefore vacated that decision and remanded the dispute back to the governing body, with instructions that it hear the matter anew.

This series of events spawned cross-petitions for certification which present two issues for this Court's consideration. The first issue relates to conflicts of interest of municipal attorneys. More particularly, we are called upon to determine the standards that govern the evaluation of such conflicts of interest, the obligations that recusal imposes on an attorney in order to adequately address a conflict of interest, and whether involvement in a matter by an attorney who was required to be recused can be excused as harmless to the outcome. The second issue before this Court is, assuming that the municipal attorney's involvement tainted the proceedings before the governing body and that its decision on the merits must be vacated, what is the appropriate remedy and the proper forum for further proceedings on the underlying application.

## I.

We derive our recitation of the facts from the record developed before the municipal Zoning Board and the governing body.

Plaintiff Kane Properties, LLC, has a contract to buy a piece of property located at 511–521 Newark Street in Hoboken. The property is located in Hoboken's I–2 zone, which is an industrial district where food processing, storage and distribution activities, manufacturing, fabricating operations, retail businesses and services, public buildings, parking facilities, parks, playgrounds, and wireless telecommunications towers are permitted uses.

At all times relevant to this matter, the property was owned by Anthony Rey. From 1980 to 2001, Rey operated a wholesale meat business known as Rey Foods at the site. Over time, as the general area around the site, both in Hoboken and in neighboring Jersey City, became gentrified, residential neighbors began to voice complaints about noise and odors emanating from Rey's business. The complaints came principally from the tenants of a nearby high-rise condominium complex known as Skyline Condominiums.

By 2001, largely due to the increasingly frequent complaints from the Skyline tenants, Rey ceased operating his business at the Hoboken site and moved the business to North Bergen. The Hoboken property has remained vacant since that time and plaintiff's contract to purchase it is conditioned on plaintiff being able to obtain the necessary variances for its proposed development plan.

A.

In 2009, plaintiff submitted an application to the Zoning Board of Adjustment of the City of Hoboken to develop the property. Plaintiff proposed to demolish the vacant buildings and to replace them with a twelve-story high-rise residential building. The new building was designed to contain seventy-two dwelling units, 1,700 square feet of space for a nursery school and daycare center, and seventy-eight parking spaces. Plaintiff's application included a request for site plan approval as well as requests for numerous variances. Among them were requests for use variances to permit residential and childcare uses, variances to permit deviations from

the floor area ratio and height limitations, and several variances for deviations from depth, lot coverage, and front- and rear-yard setback requirements. The Zoning Board held public hearings on five dates during September, October, and November 2009. Because of the nature of the arguments on appeal, we need only focus on the testimony relating to the application for a residential use variance.

Plaintiff first introduced testimony from Rey, who described the increasing difficulty he had encountered in conducting his wholesale meat operation at the property, all of which he attributed to the changing character of the neighborhood. Rey pointed to a 1992 notice that he had received from the City of Hoboken informing him that the noises made by the delivery trucks that brought meat to his place of business were causing "major disturbances in the area of the Skyline apartments."

Rey explained that although the delivery trucks were required to keep their motors running to maintain the temperature needed to keep their cargo of meat refrigerated, the Skyline tenants complained that this caused noise and pollution that adversely affected their health, safety, and welfare. As a result of their complaints, the Hoboken police served Rey with the 1992 notice ordering him to instruct the drivers of the delivery trucks to turn their motors off. Rey testified that, had he complied with that directive, he would have been in violation of the regulations imposed on him by the United States Department of Agriculture governing the safe handling of meat. Nonetheless, the notice threatened Rey with fines and with closure of his business if he failed to comply, and the police began ticketing delivery trucks parked outside of his business.

Rey eventually moved his business operation from Hoboken to North Bergen because of the difficulty he had encountered at the Newark Street location. After moving, he retained possession of the property and he testified that he attempted to sell or lease it to a fish wholesaler and to a pastry importer without success. Although he was unable to recall the names of those potential

buyers, Rey testified that each had declined to proceed with a purchase of the property because of the past difficulties Rey had experienced with the neighbors and the police.

Rey conceded that he never listed the property with a broker and he testified that it never occurred to him to try to sell the property to other dissimilar, but permitted, businesses, such as retail establishments. He explained that his efforts to sell were limited because much of the building was filled with costly refrigeration equipment that he thought would be useful only to a purchaser in a business similar in kind to his meat operation.

Plaintiff then presented the testimony of an architect who described the proposed building's design, a traffic engineer who discussed potential impacts on traffic, and a licensed professional planner who testified that, in his professional opinion, the requested variances should be granted.

The planner's testimony is the most important for our consideration of this appeal. He testified that he believed the property had been zoned into inutility because the permitted industrial uses in the zone were ones that were declining in Hoboken. He found support for this opinion by observing that only half of the property in the zone was devoted to permitted uses. He opined that the permitted uses therefore had become obsolete ones that the site could no longer accommodate. He described residential buildings as representing the emerging use, pointing to several high-rise residential buildings adjacent to or near this property.

Plaintiff's planner also opined that the property could not be used for any of the nonindustrial permitted uses in the zone, including retail businesses and services, because of the property's size, parking and traffic concerns, and because of the numerous existing similar businesses that were located nearby. He concluded that requiring the property to comply with the permitted uses in the zone would create an undue hardship.

Consistent with the required analysis of the positive and negative criteria, the planner offered his opinion that the proposed

development would improve the visual environment of the streetscape for this gateway area of Hoboken. Moreover, he maintained that granting a use variance to enable plaintiff to build the proposed residential development on the site would be consistent with the City's Master Plan, which designates the area as an industrial transition zone and which recommends that residential uses be permitted. Plaintiff's expert planner found further support for his opinion by pointing to the fact that the rear line of the property borders the neighboring municipality of Jersey City, where high-rise residential buildings are a permitted use.

In summarizing his opinion, the planner testified that he believed that plaintiff's application satisfied the statutory requirements for the requested use variances because the property could not reasonably be adapted to a conforming use and is particularly suitable for the proposed development.

The principal objector to the development proposal was Skyline Condominium Association, Inc. (Skyline), an entity representing unit owners of the large residential complex located across the street from the property in issue. Throughout the hearings before the Board, Skyline was represented by an attorney, Michael Kates, Esq. Kates participated in the hearings by cross-examining each of plaintiff's witnesses, presenting evidence and offering witnesses who testified in opposition to plaintiff's application for the variances needed to proceed with the proposed development.

As part of Skyline's presentation, Kates offered the testimony of a licensed professional planner, who opined that plaintiff had not carried its burden of proof and therefore was not entitled to the requested use variances. Contrary to the opinions offered by plaintiff's expert planner, Skyline's planner testified that the property had not been zoned into inutility because it could accommodate many of the uses permitted in the zone. Moreover, he asserted that the property is not particularly suited for development as a residential property and that plaintiff's proposal does not conform to the requirements in the Master Plan. In part, he

commented that the mere fact that the proposal would require so many variances demonstrates that "the site is not well suited for the proposed use or at least the density they are proposing."

During the public comment portion of the hearing, residents of the neighborhood where the subject property is located spoke both in favor of and in opposition to the proposed development. The neighbors who testified in support of the proposal commented that it would visually enhance the gateway to Hoboken by improving the area that currently is the site of boarded-up buildings. Those nearby residents who objected raised numerous concerns, including the safety of the daycare center's fenced-in play area, the height of the building, the negative effect on traffic in the area, the potential adverse effect on sunlight and on their current views of the Manhattan skyline and the Hudson River, and the possible diminution in their property values.

On November 4, 2009, the Zoning Board voted unanimously to approve plaintiff's preliminary site plan application and to grant all of the requested use and bulk variances, subject to a series of conditions not relevant to this appeal. A resolution memorializing the actions taken by the Board, along with its findings and conclusions, was adopted on December 15, 2009.

### B.

Dissatisfied with the action taken by the Zoning Board, on December 31, 2009, Skyline appealed to the City of Hoboken City Council. *See N.J.S.A.* 40:55D–17. In that appeal, Skyline was represented by W. Mark O'Brien, Esq., who had been substituted as counsel for the principal objector, taking the place of Kates. The substitution of counsel was necessary because in early January 2010, shortly after Skyline's appeal was filed, Kates had accepted an appointment to serve as Hoboken's Corporation Counsel, thereby becoming the legal advisor to the City Council.

In his new role, Kates was responsible for advising the City Council in connection with its consideration of appeals from decisions of the Zoning Board. On January 11, 2010, Kates wrote to

counsel for plaintiff and Skyline, using letterhead that identified him as Corporation Counsel for the City of Hoboken. The letter informed the two attorneys of the procedures that would govern appeals to the City Council and asked them to alert him to any conflicts of interest involving City Council members about which they were aware.

Plaintiff's attorney immediately responded in writing, objecting to Kates's representation of the City Council in connection with this appeal and pointing out that his previous involvement as counsel for Skyline required him to recuse himself. On January 22, 2010, Edward J. Buzak, Esq., wrote a letter advising plaintiff's attorney that Kates had recused himself from the Skyline appeal and notifying all parties that he had been designated to serve as substitute counsel for Kates representing the City Council in connection with the matter.

On February 5, 2010, Kates, acting in his capacity as Corporation Counsel, forwarded a legal memorandum he had prepared to the members of the City Council. His memorandum detailed the procedures to be used in conducting appellate hearings of Zoning Board decisions. The Kates memorandum was essentially generic and made only one reference to the timing of an unrelated appeal then pending before the City Council. It did not mention that Kates was recused from the appeal filed on behalf of Skyline.

Not long after that, when Buzak sent his own memorandum to the members of the City Council concerning the Skyline appeal, he attached a copy of the Kates memorandum. Referring to the memoranda authored by Kates and by himself, Buzak wrote that "[a]lthough there is some overlap in the two, we believe it should be useful for the Council to use both as a guide to their obligations." Plaintiff's attorney again immediately responded in writing, objecting to the submission of any legal memorandum from Kates and taking issue with certain advice Kates gave in his memorandum on the ground that it was substantively inaccurate.

On March 24, 2010, the City Council held a hearing on the Skyline appeal. Buzak appeared in his capacity as the City

Council's attorney; Kates was not present for the hearing. No new testimony was received and the proceeding was limited to hearing arguments from the attorneys who appeared on behalf of the applicant and Skyline. Immediately following those arguments, the City Council, by a 5–3 vote, reversed the Zoning Board's decision granting the variances for residential use, floor area ratio, height and number of stories. At the same meeting, however, the City Council unanimously upheld the Zoning Board's decision granting a use variance to permit construction of the childcare center, concluding that it was statutorily mandated.

On May 5, 2010, the City Council met again, this time to consider a resolution that had been drafted by Buzak to memorialize the governing body's findings and conclusions in connection with the Skyline appeal. Buzak, however, did not attend the May 5, 2010, meeting. Instead, Kates attended and served as Corporation Counsel. In that capacity, he actively participated in the meeting by answering questions about voting procedures that were posed by Council members. Moreover, after the Council had voted favorably on the resolution, Kates, still serving in his role as Corporation Counsel, signed the resolution on the line indicating that he had approved it. Thereafter, Buzak distributed copies of the signed resolution to the parties.

In the interest of creating a complete recitation of the facts relevant to this appeal, we summarize the essential findings and conclusions of the City Council as expressed in its May 5, 2010 resolution. After its de novo review of the record, the governing body concluded that it was "not satisfied that [plaintiff] ha[d] met its burden of proof." Specifically, the City Council found that there was insufficient evidence in the record compiled before the Zoning Board to prove that "the Property cannot be developed for a conforming use within the I–2 zone" or "that this site is particularly or peculiarly suitable for residential use."

The Council based those conclusions on six factors. First, the governing body used a more expansive view of the kinds of uses that are permitted in the zone, including in its resolution a list of a

wide variety of permitted retail businesses in addition to more traditional industrial uses.

Second, the Council faulted the applicant for asserting that no one was willing to devote the property to a conforming use, finding that Rey's efforts were too limited and that his focus on maintaining an industrial use was too narrow.

Third, the Council regarded the testimony of the applicant's professional planner about inutility and undue hardship to be conclusory and factually unsupported. Specifically, the Council found fault with the planner for failing to consider many of the potential conforming uses, for focusing on the other nearby nonconforming uses without acknowledging the wide variety of existing conforming uses, and for not recognizing that the positive impact of replacing an abandoned, boarded-up building with a new and attractive one would be achieved regardless of the use to which the new building would be put.

Fourth, the Council criticized the applicant's expert architect. That criticism was based in part on the architect's failure to appreciate that the positive design features of the proposed building would be equally achievable were the building devoted to a conforming use. Furthermore, the criticism was grounded in the lack of support in the record for the architect's assertion that the property was too small to support any conforming retail use.

Fifth, the Council expressed concern that neither the planner nor the architect explained why the proposed building included such significant deviations from the permitted height, number of stories, and floor area ratio, each of which the governing body considered to be drastic departures from the norm.

Finally, the Council commented on its familiarity with the zone. In doing so, the governing body acknowledged that there had been proposals to amend the ordinance to allow additional permitted uses, including residential uses, in the zone. In particular, the governing body observed that the Master Plan had suggested that residential uses be permitted both in the zone generally and for

this parcel in particular. The Council referred as well to a 2007 redevelopment study that concluded that the property in question was in need of rehabilitation. In expressing the reasons for its decision to reverse the action of the Zoning Board, the Council observed that, with full awareness of the Master Plan's recommendations, it had "deliberately decided not to amend the [zoning] ordinance...." Further, the governing body explained that its decision not to modify the permitted uses in the zone, in spite of the suggestions included in the 2007 redevelopment study and the conceded increase of residential uses in the area, was "intentional and reflects support for the uses" and other requirements still embodied in the zoning ordinance.

After expressly setting forth the contrary views of the members of the Council who would have upheld the decision of the Zoning Board, the Council weighed the positive and negative criteria. Observing that the decision of the Zoning Board was not entitled to any deference because the governing body was charged with undertaking a de novo consideration, the Council concluded that granting the requested variances would be "substantially detrimental to the public good and will substantially impair the intent and purpose of the zoning ordinance." In its view, "granting of this type of variance will impair [the Council's] intention and result in an arrogation or an appropriation by the ZBA [Zoning Board of Adjustment] of the governing body's zoning power." The City Council therefore reversed the actions of the Zoning Board, with the exception of the use variance to permit the childcare center, a decision that is not relevant to this appeal.

C.

On June 24, 2010, plaintiff filed a complaint to initiate an action in lieu of prerogative writs challenging the City Council's decision denying the requested variances. Plaintiff attacked the decision of the governing body as arbitrary, capricious and unreasonable, arguing that the unanimous decision of the Zoning Board that granted the requested variances was amply supported by the

record and should not have been overturned. Moreover, the complaint asserted that Kates's involvement in the Skyline appeal in spite of his conflict of interest had "irreparably tainted and thoroughly undermined the City Council's decision."

After conducting a de novo review on the record and hearing the arguments of the parties, the trial court, in a written decision, affirmed the Council's decision.

Beginning with plaintiff's substantive challenge to the decision of the governing body, the trial court recognized that the City Council's decision was entitled to be tested against a deferential standard. Applying that standard of review, the trial court first concluded that the governing body's findings and conclusions were adequately supported by the record and that the Council appropriately weighed and evaluated the positive and negative criteria. See N.J.S.A. 40:55D–70.

In its analysis, the trial court placed particular emphasis on the explanation given by the Council concerning its evaluation of the recommendations included in the Master Plan and the 2007 redevelopment study. The expression by the governing body that it was aware of the several recommendations to change the zone to permit residential uses and that it nonetheless declined to alter the zoning ordinance demonstrated to the trial court that the governing body had taken an intentional approach to the zone. In light of that approach, the trial court voiced its concern that condoning the Zoning Board's exercise of authority to grant the variances in spite of the Council's refusal to amend the zone "will result in an abrogation of the zoning power that is exclusively in the purview of the Governing Body." Finding in the record ample support for the decision of the Council to overturn the Zoning Board's grant of the requested variances that were the focus of the complaint, the trial court concluded that plaintiff had failed to demonstrate that the Council's decision was arbitrary, capricious or unreasonable.

Thereafter, the trial court considered, and rejected, plaintiff's argument that the Council's decision was tainted by Kates's

conflict of interest. As part of that analysis, the trial court first found that the memorandum Kates had written, which was submitted to the City Council after his recusal, was merely procedural and that it was both authored and distributed in his administrative capacity. Further, the trial court found that Kates's personal involvement during the consideration of the resolution was too minimal to have tainted the proceedings or to have influenced the decision of the City Council.

In evaluating this aspect of plaintiff's challenge, the trial court determined that the standard to be applied was one of actual prejudice. In that regard, the trial court canvassed the statutes and rules relevant to plaintiff's contention that Kates's conflict of interest entitled it to relief. The court then concluded that an "appearance of impropriety is no longer the standard to gauge the propriety of attorney conduct, thus surmise alone cannot support a finding that there was a conflict of interest in the case at hand." Finding no evidence that after Kates recused himself the Council's decision was infected by either his communications or his participation in the proceedings during which the resolution reversing the Zoning Board's action was considered and approved, the trial court found no basis to grant relief on plaintiff's complaint.

Following the trial court's dismissal of the complaint, plaintiff pursued its remedies through an appeal to the Appellate Division. In a published decision, the appellate panel concluded that the participation by Kates, in spite of his conflict of interest, tainted the action of the governing body, and it remanded the matter back to the City Council for a new proceeding de novo. *Kane Props., L.L.C. v. City of Hoboken,* 423 *N.J.Super.* 49, 53, 30 *A.*3d 348 (App.Div.2011). Although observing that the deferential standard of review used in zoning appeals would ordinarily lead to an affirmance of the Council's decision, *id.* at 64, 30 *A.*3d 348 the Appellate Division reasoned that deference would be inappropriate when the proceedings were tainted by a conflict of interest, *id.* at 65, 30 *A.*3d 348.

In its review of the contention concerning the conflict of interest, the Appellate Division first disagreed with the trial court's view about the applicable standard of review. As the appellate panel explained, the issue is whether, "in the mind of a reasonable citizen fairly acquainted with the facts, this scenario would create an appearance of improper influence." *Ibid.* Applying that standard, the Appellate Division found that Kates "indisputably" had a conflict of interest, in spite of which he participated both directly and indirectly in the proceedings. The court described the several ways in which Kates had participated and the facts on which its analysis was based:

> first, Buzak sent Kates' advice memo to the Council as part of his own advice on handling appeals; second, the Council chose to vote on the resolution at a meeting where Buzak was not present to advise them and Kates was present; third, at that meeting, Kates provided the Council some procedural advice concerning their vote on the resolution denying the variances; and fourth, Kates signed the resolution. [*Ibid.*]

Moreover, the appellate panel observed that "the Council was voting on a matter that conceivably could have gone either way," *id.* at 66, 30 *A.*3d 348 that all parties agreed the zoning was outdated, *id.* at 66–67, 30 *A.*3d 348 and that it had previously commented on the "considerable power and influence" that public attorneys have over their municipal clients, *id.* at 67, 30 *A.*3d 348 (quoting *Twp. of Lafayette v. Bd. of Chosen Freeholders*, 208 *N.J.Super.* 468, 474, 506 *A.*2d 359 (App.Div.1986)).

Taking these considerations together, the appellate court found that the circumstances would give a "reasonable citizen cause for concern." *Ibid.* Therefore, the Appellate Division concluded that "Kates should have been absolutely and completely screened from this application." *Ibid.* Because he was not, the Appellate Division reversed and remanded the matter to the City Council with instructions to "deliberate and decide the appeal as though [it] had never considered [the matter] before." *Id.* at 68, 30 *A.*3d 348 (footnote omitted). As part of its determination that the matter should be returned to the City Council, the appellate panel observed that Kates was no longer serving as Hoboken's Corpora-

tion Counsel. Therefore, to avoid any further improper influence, the court directed that his successor not provide or refer to any of the Kates advice or memoranda during the proceedings on remand. *Id.* at 68 n. 3, 30 *A.*3d 348.

Plaintiff subsequently filed a petition for certification, raising only its objection to the Appellate Division's decision that the appropriate remedy was a remand to the City Council. Defendants City of Hoboken and the City of Hoboken City Council cross-petitioned for certification, limited to the issue of whether Kates's involvement in fact created an unacceptable appearance of impropriety that incurably tainted the governing body's decision.

We granted both the petition and the cross-petition for certification. 209 *N.J.* 597, 39 *A.*3d 200 (2012).

## II.

Plaintiff argues that the Appellate Division erred in remanding this matter to the City Council for re-adjudication of plaintiff's variance requests, reasoning that a decision reversed due to taint should not be remanded to the same decision maker. Plaintiff contends that because the City Council is a quasi-judicial body, and because it has been tainted by a conflict of interest, it should be disqualified from reconsidering the matter. Moreover, plaintiff contends that the appellate panel's remand to the Council to "deliberate and decide the appeal as though they had never considered it before[,]" requires a sort of "mental gymnastics" not permitted by our disqualification rules. Plaintiff instead offers this Court two alternative remedies.

First, plaintiff requests that we exercise our original jurisdiction, *see R.* 2:10–5, and that we conduct a de novo review and render a final decision on the merits. Plaintiff submits that it has fully established both the positive and negative criteria needed for the grant of the variances it requested, including the residential use variance. *See N.J.S.A.* 40:55D–70(d). Because plaintiff believes its proofs are uncontradicted and contends that its entitle-

ment to relief is manifest, it urges this Court to avoid adding to the delay and expense caused by the Council's tainted proceeding.

In the alternative, plaintiff requests that we remand the matter to a Law Division judge who has not previously considered the City Council's decision. In addition to expressing its concern that the City Council's decision was tainted by the conflict of interest, plaintiff urges us to conclude that the Council exceeded its authority as a quasi-judicial body by basing its decision on matters outside of the record compiled before the Zoning Board. Specifically, plaintiff submits that the Council improperly decided the appeal based on "policy views," including its intentional decision not to amend the zoning ordinance. Accordingly, plaintiff urges us to direct that the matter be heard by a judge on remand who is not already familiar with the Council's decision to ensure that the policy views that plaintiff believes were an inappropriate part of that decision will not be considered on remand.

Defendants argue that the substantive basis for the Council's decision was sound and that the alleged conflict of interest did not prevent the governing body from fairly deciding plaintiff's application. Defendants first point out that both the Appellate Division and the trial court found that the governing body had properly reviewed the record and determined that the Council's decision to reverse the Zoning Board was not arbitrary, capricious or unreasonable.

Second, defendants urge this Court to reverse the Appellate Division's conclusion that the Council's decision was tainted and that a remand is required. They maintain that a knowledgeable and fully informed citizen would not have perceived that there was a conflict or an impropriety in the Council's decision-making process. They argue that the appellate court overstated Kates's involvement in the proceedings before the Council and they describe his participation as both minimal and ministerial. In short, defendants urge us to reverse the conclusion of the Appellate Division that the proceedings before the City Council were tainted

and to reinstate the judgment of the Law Division that affirmed the governing body's decision.

## III.

The dispute between the parties concerning Kates's conflict of interest requires us to consider whether, in light of his prior representation of the principal objector, his participation in the proceedings before the City Council tainted that body's decision. In evaluating that aspect of the appeal, we recognize that the parties do not disagree that Kates had a conflict of interest. Rather, their dispute centers on whether his involvement in the City Council's consideration of the appeal from the previously granted variances so tainted the decision of the governing body that it cannot stand.

There can be no question that Kates, having previously represented Skyline, had a conflict of interest when he became counsel to the governing body. Our *Rules of Professional Conduct* provide that "a lawyer serving as a government lawyer or public officer or employee of the government ... shall not participate in a matter ... in which the lawyer participated personally and substantially while in private practice or nongovernmental employment[.]" *RPC* 1.11(d)(2)(i). This language leaves no doubt that Kates had a conflict of interest [1] and he did not believe otherwise, as evidenced by his own announcement that he would be recused after plaintiff objected in response to his initial letter to counsel for the parties.

The real debate in this appeal is whether, having elected to be recused from participating in the matter, Kates was nonetheless permitted to perform any of the several acts that plaintiff asserts tainted the Council's decision. The challenged acts are: sending

---

[1] Although Kates was also subject to the requirements of the Local Government Ethics Law, *N.J.S.A.* 40A:9–22.1 to –22.25, because that statute addresses "direct or indirect financial or personal involvement," *N.J.S.A.* 40A:9–22.5(d), it is not directly applicable to the circumstances here in issue.

the initial letter to counsel involved in this appeal; preparing a generic memorandum that his substitute counsel forwarded, along with his own, to the governing body; and appearing at the May 5 meeting, in his capacity as Corporation Counsel, during which he answered questions about voting procedures and then signed the resolution on the line designating him as having approved the City Council's action.

Plaintiff asserts that Kates should not have engaged in any of these activities, but should have been completely removed from the matter, a position with which the appellate panel generally agreed. Defendants insist that the few acts Kates performed were in the nature of minor, ministerial acts that could not have affected the decision of the governing body, a position that the trial court found to be persuasive.

In addressing this argument, the trial court observed that we no longer evaluate an attorney's claimed conflict of interest in accordance with the appearance of impropriety standard. *See City of Atlantic City v. Trupos,* 201 *N.J.* 447, 464, 992 *A.*2d 762 (2010). That observation, as it relates to the conduct of attorneys generally, accords with the meaning and intent of our *RPCs. See In re Supreme Court Adv. Comm. on Prof'l Ethics Opinion No. 697,* 188 *N.J.* 549, 552, 911 *A.*2d 51 (2006); Kevin H. Michels, *New Jersey Attorney Ethics* § 18.1 (Gann 2013) (explaining 2004 amendments to *RPCs* that eliminated appearance of impropriety doctrine).

However, the appearance of impropriety standard has never been altered as it relates to judges, *see Code of Judicial Conduct, Canon* 2 ("A judge should avoid impropriety and the appearance of impropriety in all activities."), and, as our Appellate Division has observed, it remains applicable to municipal officials acting in a quasi-judicial capacity, *see Randolph v. City of Brigantine Planning Bd.,* 405 *N.J.Super.* 215, 226, 963 *A.*2d 1224 (App.Div. 2009) (citing *Kremer v. City of Plainfield,* 101 *N.J.Super.* 346, 352–53, 244 *A.*2d 335 (Law Div.1968)). For this reason, as the Appellate Division correctly recognized, because Kates was barred

by *RPC* 1.11(d)(2)(i) from being involved, and because the governing body's consideration of the appeal was a quasi-judicial act, the appearance of impropriety remains the appropriate standard against which to test his participation in the proceedings. *See Kane, supra,* 423 *N.J.Super.* at 65–66, 30 *A.*3d 348.

■ Our traditional explanation of the appearance of impropriety standard recognized that "[t]o maintain public confidence in the bar it is necessary that the appearance of, as well as actual, wrongdoing be avoided." *In re Cipriano,* 68 *N.J.* 398, 403, 346 *A.*2d 393 (1975); *accord In re Opinion No. 415,* 81 *N.J.* 318, 323, 407 *A.*2d 1197 (1979). In particular, we have commented that "[w]hen representation of public bodies is involved, the appearance of impropriety assumes an added dimension [because positions] of public trust call for even more circumspect conduct." *In re Opinion No. 415, supra,* 81 *N.J.* at 324, 407 *A.*2d 1197 (footnote omitted). As our Appellate Division has observed, when an "office calls for the service of an attorney in areas where the public interest is involved, the possible areas of conflict of interest are subject to even closer scrutiny and more stringent limitation." *Lafayette, supra,* 208 *N.J.Super.* at 473, 506 *A.*2d 359 (citing *In re Opinion No. 452,* 87 *N.J.* 45, 50, 432 *A.*2d 829 (1981)).

■ We recently articulated the manner in which a claim that a judge's act violated the appearance of impropriety standard is to be evaluated. *DeNike v. Cupo,* 196 *N.J.* 502, 514–19, 958 *A.*2d 446 (2008). We defined the appropriate standard to use in determining whether there was an appearance of impropriety in that context as: "Would a reasonable, fully informed person have doubts about the judge's impartiality?" *Id.* at 517, 958 *A.*2d 446; *see In re Tenure Hearing of Onorevole,* 103 *N.J.* 548, 561, 511 *A.*2d 1171 (1986). As we explained, if the judge's conduct gave the public "reason to lack confidence in the integrity of the process and its outcome[,]" the decision rendered would have to be reversed and the matter retried. *DeNike, supra,* 196 *N.J.* at 517, 958 *A.*2d 446.

 In establishing that approach, we did not require evidence that the judge in fact conducted the proceedings in a biased or unfair way. *Id.* at 517–19, 958 *A.*2d 446. Instead, we made clear that " 'it is not necessary to prove actual prejudice . . .' to establish an appearance of impropriety; an 'objectively reasonable' belief that the proceedings were unfair is sufficient." *Id.* at 517, 958 *A.*2d 446 (quoting *State v. Marshall,* 148 *N.J.* 89, 279, 690 *A.*2d 1, *cert. denied,* 522 *U.S.* 850, 118 *S.Ct.* 140, 139 *L.Ed.*2d 88 (1997)); *see Griggs v. Borough of Princeton,* 33 *N.J.* 207, 220, 162 *A.*2d 862 (1960) (holding that when appearance of impropriety standard applies, it is "the mere existence of a conflict, not its actual effect, which requires the official [municipal] action to be invalidated"). As we have made clear, however, the touchstone is the objectively reasonable belief, *DeNike, supra,* 196 *N.J.* at 517, 958 *A.*2d 446, and it remains true that an appearance of impropriety must be "something more than a fanciful possibility" and "must have some reasonable basis[,]" *Higgins v. Advisory Comm. on Prof'l Ethics of Supreme Court,* 73 *N.J.* 123, 129, 373 *A.*2d 372 (1977).

 We find no basis on which to conclude that a different standard should apply to an attorney advising a governing body in its performance of a quasi-judicial act. Our Appellate Division long ago observed, in considering a similar debate, that any attorney representing a municipal body enjoys a position of authority:

> An attorney advising a public body wields considerable power and influence by virtue of his ability and opportunity to interpret the law and advise on legal matters.
>
> The force of his influence is subtle and pervasive. . . .
>
> A disqualifying interest need not be direct. That there is the potential for temptation and psychological influence, regardless of whether it occurred, is sufficient under the facts here when combined with the lawyer-client relationship to vitiate the [choice made by the board].
>
> [*Lafayette, supra,* 208 *N.J.Super.* at 474–75, 506 *A.*2d 359.]

As the appellate panel in this matter observed, when he acted in his capacity as Corporation Counsel, Kates occupied a unique position of influence. *See Kane, supra,* 423 *N.J.Super.* at 67, 30 *A.*3d 348. Applying the appearance of impropriety standard in

this dispute, as with applying it to judicial functions, is essential to maintaining public confidence in the integrity of the proceedings. *See DeNike, supra,* 196 *N.J.* at 522, 958 *A.*2d 446.

■ Applying these standards to this appeal leaves no doubt that an objectively reasonable, fully informed member of the public would perceive that the participation by Kates in the proceedings calls into question the impartiality of the governing body and the integrity of the proceedings. To be sure, we recognize that there is room for debate about whether the initial letter to counsel could have tainted the decision of the governing body. That letter, apparently a form letter sent to counsel in all of the pending appeals from decisions of the Zoning Board, merely announced to the parties who Kates was and asked them for information that might reveal a conflict calling for disqualification of any of the members of the City Council. Indeed, it was that letter that led to plaintiff's objection, to Kates's recusal, and to the substitution of Buzak to advise the governing body in his place.

Even so, although one might excuse Kates from responsibility for Buzak's decision to forward the Kates memorandum to the City Council along with his own, doing so was plainly inappropriate in light of Kates's recusal. We need not address, however, whether in light of the generic matter discussed in the memorandum, Buzak's act alone would call the governing body's decision into question. Instead, we need only focus on plaintiff's argument that Kates's actual participation in the proceedings entitles it to relief.

Even if the other acts by Kates and Buzak could be excused, there is no ground on which to conclude that the involvement of Kates during the May 5 meeting was appropriate. His participation was no different from what would have been expected of his substitute counsel had he appeared. Kates acted as counsel to the governing body, he answered questions from Council members, he advised them on voting procedures, and he signed the resolution following their vote to indicate that he had approved it. These were simply not minor, ministerial acts. Just as we found

no room for concluding that a judge who should have been recused from a matter was permitted to execute an uncontested form of judgment, *see id.* at 516, 958 *A.*2d 446, here we find no merit to the argument that Kates's involvement in the May 5 meeting can be countenanced.

In this dispute, the problem arises from what can best be described as the incomplete recusal of the attorney who had the conflict of interest. Having recognized that conflict, having announced to the parties that he would recuse, having turned over the role of counsel to the governing body to another lawyer for purposes of the appeal, Kates then set aside his recusal and stepped back into the role he should not have played.

Any reasonably informed member of the public would have reacted to his involvement as plaintiff did, with a concern that he was exerting an improper influence on the decision-making body. Recusal, if it is to have any meaning at all, must neither be porous nor partial. Indeed, as we observed in a related context, "recusal connotes and demands complete separation[;] ... [i]t obligate[s one] to remain completely disassociated from the case." *In re Perskie,* 207 *N.J.* 275, 284, 24 *A.*3d 277 (2011) (imposing discipline on former judge based on incomplete recusal).

In like fashion, recusal of an attorney advising a municipal decision-making body must involve a complete separation from any aspect of the matter whatsoever so that public confidence in the decision-making body will be safeguarded and public confidence in the eventual decision will be maintained. Because the incomplete recusal of corporation counsel irretrievably tainted the action taken thereafter by the City Council, its decision must be set aside.

## IV.

Having concurred with the Appellate Division that the decision of the City Council was tainted by the conflict of interest of its attorney and that the governing body's resolution must be

set aside, we turn to the question of the appropriate remedy. Although the appellate panel concluded that the matter should be remanded to the City Council for consideration anew, plaintiff asserts that it is entitled to be heard by an entirely different, untainted decision maker. Our determination of the appropriate forum for further proceedings requires that we evaluate the role played by each of the decision-making bodies relevant to this dispute.

 The statutory framework established by the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –163, permits responsibility for decisions on land use applications, in general, to be divided between the planning board and the zoning board. Pursuant to the MLUL, when that organizational approach is utilized, the planning board exercises the powers described in *N.J.S.A.* 40:55D–25, and the zoning board retains the power to grant variances from the established zoning ordinance, *see N.J.S.A.* 40:55D–70. In that rather common scenario, a party aggrieved by the decision of the planning board or the zoning board can pursue its appellate remedy by way of an action in lieu of prerogative writs filed in the Law Division of the Superior Court. *See R.* 4:69–1 to –7. There, the decision of the planning board or the zoning board is tested against an indulgent standard, which permits the court to overturn the decision being reviewed only if it is arbitrary, capricious or unreasonable. *See Kramer v. Bd. of Adjustment,* 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965). Moreover, in that forum, the decision of the board is entitled to deference; its factual determinations are presumed to be valid. *Ibid.*

Less commonly encountered in our case law is the provision in the MLUL that permits a party to appeal, under certain circumstances, to the municipality's governing body. *N.J.S.A.* 40:55D–17. The statute imposes two kinds of limitations on the pursuit of an interim appellate challenge to the governing body. First, review of this type is available only "if so permitted by ordinance." *N.J.S.A.* 40:55D–17(a). Second, the statute allows an appeal to

the governing body only from a "final decision of a board of adjustment approving an application for development pursuant to [*N.J.S.A.* 40:55D–70(d) ]" of the MLUL. *N.J.S.A.* 40:55D–17(a). Therefore, the right to pursue an appeal to the governing body requires that the municipality have in effect an ordinance permitting such an appeal and that the zoning board have granted an application for a "d" variance.

As originally enacted, the scope of matters that the MLUL permitted interested parties to appeal to the governing body was far broader. *See* William M. Cox & Stuart R. Koenig, *N.J. Zoning and Land Use Admin.* §§ 32–1 to –3 (Gann 2013). In addition to a permissible appeal from any decision of a zoning board approving a "d" variance, the statute also allowed appeals from other actions of the zoning board as well as from planning board decisions if permitted by local ordinance. *See L.* 1975, *c.* 291, § 8.

The section authorizing interim appellate remedies was amended in 1984, at which time the more limited language relating to an appeal to the governing body now included in the MLUL was substituted for the earlier, broader grant of authority. *See L.* 1984, *c.* 20, § 6. At the time, the Legislature expressed the reasoning that motivated its decision to impose limits on the permitted grounds for the interim appeal to the governing body. As the statement that accompanied the bill explained, the section was designed

> to (1) limit appeals to the governing body to approvals of "special reasons" or "use" variances, (2) give the governing body the option of determining by ordinance whether it will offer to hear these appeals, (3) give the objector the option of going directly to court even if a governing body appeal is available and (4) clarify the governing body's power over an appealed decision. These amendments will preserve the governing body appeal for approvals of the most drastic departures from municipal development regulations (if this is agreeable to the governing body and the objector).
>
> [Statement to Assembly Bill No. 1169 (Jan. 30, 1984).]

We have previously pointed out that there is a significant difference between an appeal to the governing body from the grant of a use variance, which the MLUL authorizes only if

permitted by local ordinance, and an appeal from the denial of a use variance, which the MLUL only permits to be taken by way of an action in lieu of prerogative writs filed in the Superior Court. *See Comm. for a Rickel Alt. v. City of Linden,* 111 *N.J.* 192, 202, 543 *A.*2d 943 (1988). Writing for the majority of this Court, Justice Clifford explained:

> The distinction is an important one: by limiting review to only those applications that are granted, the governing body is involved solely in those decisions that might actually impair or significantly affect the master plan or zoning ordinance, otherwise leaving intact the exercise of the board's discretion in denying the application.
> [*Ibid.*]

Moreover, we concluded that in limiting the scope of matters that the governing body may elect to review, the Legislature intended that the review to be exercised would be different from that which is afforded by a reviewing court. In the words penned by Justice Clifford, this Court pointed out that "[i]f the governing body were to be limited, as is a court, to the determination of whether the board's action was arbitrary, unreasonable, or capricious, then there would be no reason to provide for that procedural option." *Id.* at 202–03, 543 *A.*2d 943. Significantly, this Court described the governing body as being "perhaps uniquely qualified" to determine whether granting a requested use variance would substantially impair the municipality's zoning ordinance or its master plan. *Id.* at 203, 543 *A.*2d 943.

That is, the governing body, in conducting its review of the zoning board's grant of a use variance, is not limited to weighing the decision of the board against the relatively indulgent arbitrary, unreasonable or capricious standard as would apply to proceedings in court. Instead, its decision to adopt an ordinance in which it has retained the power to hear an appeal from the zoning board is one which entitles it to de novo review. *See Evesham Twp. Bd. of Adjustment v. Evesham Twp. Council,* 86 *N.J.* 295, 300, 430 *A.*2d 922 (1981). Moreover, it is entitled to bring to bear, in its consideration of the record that has been compiled, its understanding of the existing zoning ordinance and

the Master Plan. *See generally Medici v. BPR Co.*, 107 *N.J.* 1, 20, 526 *A.*2d 109 (1987) (observing that there is less likely to be "[t]ension between use variances and the zoning ordinance and master plan" in municipalities where governing body exercises interim appeal option).

In the end, when the governing body has elected to create an appellate avenue, it is the governing body that is entitled to determine whether a deviation from its established zoning plan should be granted. In that circumstance, it is the governing body's view of the overall development pattern and the intention of the zoning plan, and in particular, its view about whether a proposed deviation would substantially impair the ordinance or the zoning plan that is entitled to deference. *See Jayber, Inc. v. Mun. Council of W. Orange*, 238 *N.J.Super.* 165, 173, 569 *A.*2d 304 (App.Div.) (observing that court must "accord the action of the governing body—not the board of adjustment—the presumption of validity"), *certif. denied*, 122 *N.J.* 142, 584 *A.*2d 214 (1990). And it is equally within the authority of the governing body in such circumstances to bring its views concerning the intention of its zoning plan to bear in addressing the matters raised on appeal before it.

These principles directly impact on our consideration of the debate between the parties concerning the appropriate remedy that should be utilized in the circumstances of this appeal. Plaintiff argues that the decision of the Appellate Division to remand the matter to the City Council was in error, asserting that it cannot fully and fairly consider the matter anew because it has been irretrievably tainted. Plaintiff therefore urges us either to exercise our original jurisdiction and decide the matter on the merits, thus avoiding further delay and expense, or to remand the matter to the Law Division, with directions that it be heard by a different judge to prevent any lingering influence of the tainted proceedings. Defendants disagree, asserting that if a remand is needed, it must be to the City Council in order to honor the

objector's right to be heard on appeal in the first instance by the governing body.

Our evaluation of the appropriate remedy requires us only to select the correct forum for determining on remand whether the decision of the Zoning Board should be upheld. Ordinarily, when a party challenges a zoning board's decision through an action in lieu of prerogative writs, the zoning board's decision is entitled to deference. Its factual determinations are presumed to be valid and its decision to grant or deny relief is only overturned if it is arbitrary, capricious or unreasonable. *Burbridge v. Twp. of Mine Hill*, 117 *N.J.* 376, 385, 568 *A.*2d 527 (1990); *Kramer, supra*, 45 *N.J.* at 296, 212 *A.*2d 153.

However, when the governing body of the municipality has enacted an ordinance that permits it to entertain an appeal from the grant of a use variance, *N.J.S.A.* 40:55D–17, it is not so constrained. Although it is required to conduct the proceeding de novo, and is limited to consideration of the record established before the zoning board, *see* Cox & Koenig, *supra*, § 32–8, in reaching its decision, the governing body need not accord the zoning board any deference. As we have explained:

> While the present law does not set forth in precise terms the scope of review to be applied by the governing body, we find in the statutory language a clear indication that the Legislature intended that where the action of a board of adjustment is challenged on appeal, the governing body is to have authority to make a *de novo* review of the record established before the board and reach its own decision in the matter subject only to the requirement that its findings and conclusions are supported by the record.
>
> [*Evesham, supra*, 86 *N.J.* at 300, 430 *A.*2d 922; *accord Cerdel Constr. Co. v. Twp. Comm. of East Hanover*, 86 *N.J.* 303, 304, 430 *A.*2d 925 (1981).]

This section of the MLUL was amended to delineate the powers of the governing body exercising its interim appellate function following our decision in *Evesham*, apparently in response to our observation that the scope of the review was not identified with precision. *See id.* at 300, 430 *A.*2d 922. Nonetheless, as we have concluded previously, that amendment did nothing to diminish the power of the governing body to apply its own expertise, its own knowledge of the community, and its own view of the overall plan

for the zone in performing its review. *Comm. for a Rickel Alt.*, *supra*, 111 *N.J.* at 199, 543 *A.*2d 943; *see generally Illes v. Zoning Bd. of Adjustment of Edison*, 203 *N.J.Super.* 598, 603–04, 497 *A.*2d 596 (Law Div.1985) (reviewing legislative history of amendment and concluding that it did not undercut governing body's authority to apply its own expertise and knowledge). Rather, the MLUL merely restricts the governing body to the evidence and testimony presented during the hearing before the zoning board. When the action of a zoning board is challenged, however, the governing body, which is directly responsible for the citizenry, has the right to apply its own expertise and knowledge of the community and make the final evaluation based on the record created below. *Evesham*, *supra*, 86 *N.J.* at 301, 430 *A.*2d 922.

Although a reviewing court would accord deference to the zoning board's findings and conclusions when called upon to review that body's decision, as the Appellate Division pointed out, when the court reviews the action of the governing body, it is obliged to accord the action of the governing body, not the action of the zoning board, a presumption of validity and to defer to its judgment and its knowledge of local conditions as long as its decision does not amount to an abuse of discretion. *Kane*, *supra*, 423 *N.J.Super.* at 64, 30 *A.*3d 348; *see Riese–St. Gerard Hous. v. Paterson*, 249 *N.J.Super.* 205, 215, 592 *A.*2d 270 (App.Div.1991); *Jayber*, *supra*, 238 *N.J.Super.* at 173, 569 *A.*2d 304; *accord Kinderkamack v. Mayor of Oradell*, 421 *N.J.Super.* 8, 21, 22 *A.*3d 129 (App.Div.2011).

This matter therefore presents us with a significant challenge as it relates to the appropriate forum for resolution of the dispute because we have concluded that the decision of the City Council was tainted. In this context, the choice of a forum for the proceedings on remand dictates the degree of deference to be accorded to the Zoning Board's resolution. The Appellate Division, recognizing the right of the City Council to review the Zoning Board's determinations and its right to do so without any deference to the zoning board's view of the wisdom of the zoning

scheme, concluded that the governing body was the appropriate forum to conduct proceedings on remand. We, however, cannot agree. Although that choice would uphold the governing body's election to retain oversight of the Zoning Board's decisions to grant use variances, it would not suffice to cure the taint of conflict when tested against the appearance of impropriety standard that we have established must be applied.

At the same time, a remand to the Law Division, in circumstances in which the City Council's determinations have been stricken based on its attorney's conflict of interest, would elevate the Zoning Board's decision by cloaking it with a deference that is inappropriate in light of the role that should be played by the City Council. That approach would unfairly deprive the City Council of its opportunity to "apply its own expertise and knowledge" to the application for a use variance. *Evesham, supra,* 86 *N.J.* at 301, 430 *A.*2d 922.

In these unusual circumstances, we think it appropriate to craft a remedy that will balance the rights of the parties and that will also recognize the proper roles that would ordinarily be played in the process by the two levels of municipal decision makers. We therefore direct that the matter be remanded to the Law Division, which shall conduct a de novo review of the Zoning Board's resolution. We further direct that, as a part of that proceeding, the court shall entertain such arguments or supplements to the record that may be presented on behalf of the City Council and that bear upon its own "expertise and knowledge" of the zoning scheme. We also direct that the trial court shall give due consideration to the expressions that illuminate the City Council's evaluation of whether the proposed use variances satisfy the positive and negative criteria imposed by the MLUL.[2]

---

[2] In light of our conclusion that the City Council is entitled to offer such arguments and supplements, we deem the exercise of our original jurisdiction to be inappropriate. *See Tomaino v. Burman,* 364 *N.J.Super.* 224, 234–35, 834 *A.*2d 1095 (App.Div.2003), *certif. denied,* 179 *N.J.* 310, 845 *A.*2d 135 (2004).

Finally, although we have the utmost confidence in the Law Division judge who first heard the action in lieu of prerogative writs, we are sensitive to the concern about a lingering taint that has been expressed by plaintiff. Therefore, in recognition of the fact that the governing standard is appearance of impropriety, and in an abundance of caution, we direct that the matter be remanded to the Law Division and that it be assigned to a judge who has not previously evaluated the matters in dispute.

## V.

The judgment of the Appellate Division is affirmed as modified and the matter is remanded to the Law Division for further proceedings consistent with the principles to which we have adverted.

*For affirmance as modified/remanded*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, RODRÍGUEZ (t/a) and CUFF (t/a)—7.